**In re Lucille Saundra WHITE, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 463929).**

**Nos. 09–BG–1012, 10–BG–795.**

District of Columbia Court of Appeals.

Submitted Oct. 26, 2010.
Decided Jan. 20, 2011.

---

No brief was filed on behalf of respondent.

Wallace E. Shipp, Jr., Bar Counsel, and Judith Hetherton, Senior Assistant Bar Counsel, and Julia L. Porter, Senior Assistant Bar Counsel, were on the brief for the Office of Bar Counsel.

Before KRAMER and OBERLY, Associate Judges, and BELSON, Senior Judge.

PER CURIAM:

The Board on Professional Responsibility has filed two separate reports and recommendations with this court concerning respondent, Lucille Saundra White, arising from separate matters that occurred during the same period. In its first report, issued on August 20, 2009, the Board recommended that respondent be suspended

for six months and be required to demonstrate fitness as a condition for reinstatement for violating Rule 1.11 of the District of Columbia Rules of Professional Conduct (conflict in successive government and private employment). Respondent filed exception to that report and recommendation of the Board in its entirety. Bar Counsel excepts to the Board's finding that it had not been proved that White violated Rule 8.4(d) (serious interference with the administration of justice). In a second report, as amended on July 28, 2010, the Board recommended that respondent be disbarred for violating Rule 3.4(a) (alteration of evidence); Rule 3.4(b) (falsification of evidence and false testimony); Rule 8.1(a) (false representation in connection with a disciplinary matter); Rule 8.4(b) (criminal act that reflects adversely on lawyer's honesty, trustworthiness, or fitness); Rule 8.4(c) (dishonesty, fraud, deceit or misrepresentation); and Rule 8.4(d) (serious interference with the administration of justice). Neither respondent nor Bar Counsel filed an exception with respect to that report and recommendation.

The two reports of the Board have been consolidated for review by this court. We adopt the Board's findings and its recommended sanction in the second matter referred to above and set forth in the July 28, 2010, Amended Report. We also adopt the Board's findings and recommended sanctions in the August 20, 2009, Report, other than the Board's determination that Bar Counsel had not proven that respondent violated Rule 8.4(d). Respondent has filed no briefs with this court in either matter.[1] We order that respondent Lucille Saundra White be disbarred.

## I.

### Standard of Review

In a disciplinary case, this court accepts the Board's findings of fact "unless they are unsupported by substantial evidence of record." D.C. Bar R. XI, § 9(g); *In re Pierson,* 690 A.2d 941, 946–47 (D.C.1997). This court reviews the Board's legal conclusions *de novo. In re Fair,* 780 A.2d 1106, 1110–11 (D.C.2001). We shall adopt the recommended disposition of the Board " 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.' " *In re Cleaver–Bascombe,* 986 A.2d 1191, 1194 (D.C.2010) (quoting D.C. Bar R. XI, § 9(h) (2006)). The Board, in turn, is required to accept the factual findings of the hearing committee that are supported by substantial evidence in the record, viewed in its entirety. *In re Micheel,* 610 A.2d 231, 234 (D.C.1992). "However, the Board owes no deference to the hearing committee's determination of 'ultimate facts,' which are really conclusions of law." *Id.*

1. On November 9, 2009, following the issuance of an order to show cause to which respondent never responded, we suspended respondent from the practice of law pursuant to D.C. Bar R. XI, § 9(g) and construed respondent's September 28, 2009 motion to vacate the report and recommendation of the Board as her exceptions. We directed Bar Counsel to file its brief first, and respondent to file her brief within thirty days thereafter. Bar Counsel filed its brief on December 21, 2009. On February 4, 2010, the court still had not received a brief from respondent and ordered that respondent file within fifteen days of the date of that order. On March 16, 2010, having considered that respondent had still not filed a brief, we ordered that the matter be scheduled on the regular calendar on the report and recommendation of the Board and the Bar Counsel's brief. Respondent asserted in a belated request for oral argument filed on the day the matters were scheduled for submission to the court that she had filed briefs in both matters. No such briefs are present in the record of the court or of Bar Counsel.

## II.

### August 20, 2009 Report

On August 20, 2009, the Board on Professional Responsibility concluded that respondent violated D.C. Bar Rule 1.11 (conflict in successive government and private employment), stemming from respondent's representation of Ms. Gladys Thomas. During respondent's tenure as head of the investigating unit at the District of Columbia Office of Human Rights ("OHR"), she had supervised the investigation of an age discrimination complaint filed by Ms. Thomas arising out of her discharge from a position with the Department of Consumer and Regulatory Affairs. The investigating agent had provided respondent with a draft Letter of Determination ("LOD") concerning Ms. Thomas's complaint in July 2002; OHR's final LOD advised Ms. Thomas that there was no probable cause to support her complaint.

Ms. Thomas pursued her age discrimination allegation by filing suit in the United States District Court for the District of Columbia on January 9, 2003, the same month that respondent was terminated from OHR. In an e-mail between Ms. Thomas's counsel, Ms. Janet Cooper, and respondent dated January 6, 2004, the two discussed entering a "co-counsel" relationship for Ms. Thomas's suit. In mid-December 2003, respondent had telephoned an unidentified representative at the D.C. Bar Ethics Counsel to inquire about engaging in this representation; however respondent provided only "a partial description of the relevant facts" during that call and specifically omitted her involvement with the Thomas case while she was at OHR. Thereafter, respondent participated in reviewing and editing court filings, including a draft motion on behalf of Ms. Thomas, and attended a deposition of a witness in the case, Bernard Ferguson. Following respondent's attendance at the Ferguson deposition on January 13, 2004, Michael Bruckheim, the attorney representing the District, contacted Ms. Cooper to complain about respondent's involvement as a violation of Rule 1.11; he filed a motion to disqualify respondent and Ms. Cooper after Ms. Cooper refused to withdraw. Ms. Cooper and respondent each filed an affidavit asserting that respondent had not played a substantive role concerning Ms. Thomas's case while at OHR.

On June 29, 2004, U.S. District Court Judge Royce C. Lamberth granted the motion to disqualify both respondent and Ms. Cooper, on the basis that respondent was the supervisor overseeing the investigation of Ms. Thomas's claim while she was at OHR. Bar Counsel filed charges against respondent on July 6, 2005, alleging that she had violated Rule 1.11 and Rule 8.4(d) (serious interference with the administration of justice), and evidentiary hearings followed from December 2005 through April 2006.

On April 9, 2007, Hearing Committee Number Five found that respondent's representation of Ms. Thomas was adverse to the District of Columbia government, and was on a matter in which respondent had been personally and substantially involved when she worked in OHR. However, the Committee concluded that Bar Counsel had not proven a violation of Rule 8.4(d).

Bar Counsel filed a brief in support of its exception to the conclusion regarding Rule 8.4(d) on June 15, 2007. Respondent filed her exceptions to Hearing Committee Number Five's report on June 21, 2007, which was well past an extended due date of May 24, 2007. Oral argument was scheduled on June 21, 2007, but respondent failed to appear. On July 2, 2007, the Board issued an order accepting respondent's lodged brief for filing but denied her request to reschedule oral argument.

On August 20, 2009, the Board issued a report agreeing with the Hearing Committee that respondent had violated Rule 1.11 and that Bar Counsel had not proven a violation of Rule 8.4(d), and recommended that respondent be suspended for six months and be required to demonstrate fitness as a condition of reinstatement. On November 9, 2009, this court suspended respondent pending final action on the Board's report. On December 21, 2009, Bar Counsel filed with this court a Brief in Support of its Limited Exception to the Board on Professional Responsibility's Failure to Find that Respondent also Violated Rule 8.4(d). In its brief, Bar Counsel, like the Board, recommends that respondent be suspended for six months for these violations.

We adopt the Board's conclusion as to the Rule 1.11 violation, but disagree with the Board's determination concerning Rule 8.4(d). We incorporate the Board's report of August 20, 2009, herein as set forth in Appendix A.[2]

▮▮▮ To establish a violation of Rule 8.4(d), Bar Counsel must show (1) that the attorney acted improperly in that the attorney either " '[took] improper action or fail[ed] to take action when ... he or she should [have] act[ed]'; (2) that the conduct involved 'bear[s] directly upon the judicial process (*i.e.*, the "administration of justice") with respect to an identifiable case or tribunal'; and (3) that the conduct 'taint[ed] the judicial process in more than a *de minimis* way,' meaning that it 'at least potentially impact[ed] upon the process to a serious and adverse degree.' " *In re Owusu*, 886 A.2d 536, 541 (D.C.2005) (quoting *In re Hopkins*, 677 A.2d 55, 60–61 (D.C.1996)) (alterations in original).

The Board concluded that respondent's actions did not clearly satisfy these three criteria. It reasoned that though Judge Lamberth disqualified respondent, a "disqualification motion, without more, does not support a finding that the conduct was a serious interference with the administration of justice." *See In re Hallmark*, 831 A.2d 366, 375 (D.C.2003) (requiring more egregious conduct than burden on court's administrative process). The Board also noted that Bar Counsel was unable to cite any case in which a Rule 1.11 violation standing alone supported a Rule 8.4(d) violation. It was the Board's view that it would have "a pernicious effect on the administration of justice and the representation of individual clients [ ] [i]f the unsuccessful defense of a motion to disqualify were held to constitute sanctionable misconduct...." The Board reasoned that such a holding might lead "lawyers with meritorious defenses [to] ... withdraw unnecessarily, rather than risk exposure to disciplinary charges."

Board member Mercurio, joined by member Bolze, dissented from the Board's conclusions insofar as they pertained to Rule 8.4(d). He stated that the Board's conclusion fails to recognize that respondent's conduct met the test for impropriety under the third of the three *Hopkins* criteria, that "the attorney's conduct must taint the judicial process in more than a *de minimis* way, that is, *at least potentially* impact upon the process to a serious and adverse degree. *Hopkins*, 677 A.2d at 61 (emphasis added)."

The dissenting statement took note of the Hearing Committee's finding that respondent "undertook to act as co-counsel with Ms. Cooper in representing G. Thomas in her federal court suit." Respondent thereby "showed a willingness and an abili-

---

**2.** Although we do not adopt the Board's conclusion as to whether a Rule 8.4(d) violation was proven, we incorporate the Board's Rule 8.4(d) analysis herein at Appendix, A, 23–26.

ty ... to impart OHR confidential information to Cooper and Thomas," and "actually gave them her recollection about Thomas's OHR investigation file and a tape recording of her interview of the OHR investigator in Thomas's case who investigated, or failed to investigate, matters Thomas complained about." This and other related conduct, the statement concluded, "threatened to give Thomas and Cooper a significant and unfair advantage over their adversaries in Thomas's federal action, and thus posed, at the very least, a " 'potential impact upon the process [in that lawsuit] to a serious and adverse degree.' "

Bar Counsel, in urging this court to conclude that respondent violated Rule 8.4(d), cites the dissenting statement of the two Board members, and also notes that Judge Lamberth expressly found that respondent's participation in the deposition of witness Ferguson " 'tainted' " the federal court proceedings, leading the court in its words to strike the deposition " 'because of the critical interests at stake with respect to the integrity of the judicial system.' " (Brief for Bar Counsel at 14, n. 12 (quoting Bar Exhibit 8q at 12–13)). Bar Counsel points out that respondent's misconduct with respect to the federal court action was far more extensive than the evidence brought before Judge Lamberth in connection with the Ferguson deposition, and to make that point refers to some of the misbehavior discussed in the language quoted above from the Board dissent. Bar Counsel also points to respondent's reviewing and editing co-counsel's brief in the federal action, which argued that respondent's former employer, OHR, improperly handled the Ms. Thomas matter that respondent had supervised. (*Id.* at 28.).

Bar Counsel's position finds support in *In re Evans*, 902 A.2d 56, 58 (D.C.2006), where this court found a Rule 8.4(d) violation based on the conflict arising from counsel's dual roles in a single transaction. Respondent there had a conflict of interest that arose from his dual roles as the owner of a title company that handled real estate closings and as a lawyer whose practice included both probate and real estate matters. He undertook to represent a borrower in order to secure title for her to real property that belonged to the unprobated estate of her deceased mother-in-law, and thereby allow her to go to closing before respondent's title company. The conflict in *Evans* was less problematic than the conflict involved in the instant case because, as noted in *Evans*, respondent there could have attempted to secure a waiver of the conflict, something that respondent here doubtless could not achieve.

While we afford great respect to a conclusion of the Board as to whether a disciplinary rule has been violated, we are not persuaded by its reasoning in this instance. Nor do we share its concern that a ruling that respondent's conduct at issue violated Rule 8.4(d) here would have a "pernicious effect" on the administration of justice and the representation of individual clients. What is before us is not simply a matter involving an attorney who unsuccessfully resisted a motion to disqualify. We consider not only the outcome of the disqualification motion, but also the nature of the misconduct that led to the filing of the motion to disqualify and the related misconduct that was not even before the judge who found that the respondent's misconduct had "tainted" the proceedings.

■ We conclude that the evidence clearly and convincingly supports the conclusion that respondent violated Rule 8.4(d) with respect to her conduct during the Thomas litigation in federal court. The actions Judge Lamberth concluded that he was required to take can be said to

have affected the judicial process in more than a *de minimis* manner. The entire litigation was disrupted and delayed while the District Court dealt with the motion to disqualify Ms. Cooper and respondent. Judge Lamberth concluded that respondent's participation had tainted the proceedings and struck the deposition of Bernard Ferguson because of respondent's presence. Ms. Cooper died while Ms. Thomas's Motion to Reconsider was still pending; nevertheless, Judge Lamberth concluded that respondent could not reenter the litigation because of her taint.

Of still greater significance to the federal court litigation were the related actions cited above that respondent took to share her knowledge of the proceeding before OHR, her former employer, with co-counsel and client, the plaintiff, that threatened to give the plaintiff in the federal action an unfair advantage over her adversary and presented at least a "potential impact upon its process to a serious and adverse degree."

For the foregoing reasons, this court finds that respondent's conduct tainted the judicial process in more than a *de minimis* way and, contrary to the Board's recommendation, concludes that respondent violated Rule 8.4(d).

### III.

### July 20, 2010 Amended Report

██ The charges dealt with in the Board's July 28, 2010, Amended Report arose from respondent's conduct in connection with "whistleblower" claims she alleged against her employer, OHR, and subsequent dealings with the Office of Inspector General ("OIG") and the Council of the District of Columbia in connection with those allegations. We adopt the Board's report (incorporated herein as Appendix B), which sets forth and adopts the Hearing Committee's detailed findings of fact concerning respondent's misconduct, and offer a short summary of those findings of fact here.

Respondent's misconduct arose from a complex series of events, beginning with her hiring at OHR in December 2000. As head of the investigating unit, respondent was partially responsible for the contracting duties of the office. In June 2001, respondent's supervisor began efforts to terminate her employment for performance reasons.

In an apparent attempt to head off her termination, respondent filed a "whistleblower" complaint with OIG on July 20, 2001, regarding an allegedly improper contract between OHR and a private attorney, Vere Plummer. In the sequence of events that followed, respondent engaged in an elaborate and extraordinary series of actions to shore up her allegations of improper contracting by OHR by furnishing documents and other evidence to OIG investigating agents and even to D.C. Council member Vincent Orange. An ensuing investigation by OIG demonstrated that respondent had manipulated and fabricated documents that she presented before the Council and had testified falsely before the Council, purporting to recount events that actually never took place. Bar Counsel initiated his own investigation of respondent and brought the charges now before us. Hearing Committee Number Nine concluded that three documents that respondent introduced as evidence to the Committee were either altered versions of other documents, or of doubtful authenticity. Based on these conclusions, Hearing Committee Number Nine agreed with Bar Counsel that respondent had violated Rules 3.4(a), 3.4(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). The Board subsequently adopted the Hearing Committee's report and recommended disbarment.

We adopt the Board's report, incorporated herein as Appendix B. We accept the conclusion that it demonstrates by clear and convincing evidence that respondent violated Rules 3.4(a), 3.4(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). We turn to a discussion of the appropriate sanctions.

## IV.

### Sanctions

The Board on Professional Responsibility's proposed sanction comes to this court with a strong presumption in favor of its imposition. *In re Goffe*, 641 A.2d 458, 463 (D.C.1994). Where this court has concluded that the attorney's conduct falls into a category of dishonesty of a flagrant kind it has held disbarment to be the appropriate sanction. *In re Cleaver–Bascombe*, 986 A.2d at 1199. Whether the recommended disciplinary action is appropriate depends on a review of the respondent's violations in light of relevant factors, including "the nature of the violation," "the mitigating and aggravating circumstances," "the need to protect the public, the courts, and the legal profession," and "the moral fitness of the attorney." *Id.* at 1195 (internal quotation marks omitted).

In evaluating these factors, the Board's report as amended on July 28, 2010, focuses on the seriousness of the conduct, the prior offense (referring to the August 20, 2009, report dealing with the representation of Ms. Thomas), the prejudice it caused to the reputation of OIG employees, and especially the respondent's attitude throughout the proceedings. Regarding respondent's attitude during its investigations, the Board emphasized that "[a]t no point did [r]espondent express any hint of regret or remorse for anything that has happened since 2001 or any acknowledgment of wrongdoing." It also noted her "erratic" behavior, citing her accusation that the Hearing Committee

chairman was biased against her. The Board also considered the impact of the prior disciplinary proceedings—referring to the recommended sanctions for respondent's misconduct in connection with her representation of Ms. Thomas—as further evidence of inconsistencies in her testimony before the Board. Based on these considerations, the Board concluded that there are no mitigating factors and that disbarment is warranted based on the severity of the misconduct.

■ The Board's recommendation of disbarment is supported by *In re Cleaver–Bascombe*, where this court disbarred an attorney for submitting fraudulent vouchers for payment under the Criminal Justice Act, even though there the Board had recommended only a two-year suspension. 986 A.2d at 1191. We agree with the Board that here, respondent's actions are even more egregious than Cleaver–Bascombe's because respondent engaged in several episodes of misconduct, and put at risk more careers than just her own. The conduct in question is indeed serious: the record reflects that respondent made false accusations to the Council of the District of Columbia, fabricated evidence to support those accusations, and falsely recounted events that never occurred. Moreover, respondent has not presented a substantive defense to these allegations. The two separate cases of misconduct in question here demonstrate that respondent "lacks the moral fitness to remain a member of the legal profession." *Id.* at 1200–01. Therefore, disbarment is the proper sanction in this instance in order to protect the public and the courts, to maintain the integrity of the profession, and to serve as a deterrent. *In re Uchendu*, 812 A.2d 933, 941 (D.C. 2002). It is

ORDERED that Lucille Saundra White is disbarred from the practice of law in the

District of Columbia, effective thirty days from the date of this opinion. *See* D.C. Bar R. XI, § 14(f). Respondent shall not be eligible for reinstatement for five years from the effective date of disbarment, pursuant to D.C. Bar R. XI, § 16(a).

*So ordered.*

## APPENDIX A

### DISTRICT OF COLUMBIA COURT OF APPEALS

### BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: L. SAUNDRA WHITE, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 463929)

Bar Docket No. 292-04

### *REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

Respondent is charged with violating Rule 1.11 by accepting employment on behalf of Ms. Gladys Graye Thomas in 2003–2004 in a matter on which Respondent had been personally and substantially involved as an employee of the District of Columbia Office of Human Rights in 2002. Bar Counsel also charged her with conduct that "seriously interferes with the administration of justice" in violation of Rule 8.4(d) because her assistance of Ms. Thomas triggered a successful motion for her disqualification in Ms. Thomas' lawsuit against the District of Columbia. The matter was heard by Hearing Committee Number Five (the "Hearing Committee"), which found a violation of Rule 1.11 but not Rule 8.4(d). The Hearing Committee recommended that Respondent be suspended for 30 days and required to demon-

strate fitness as a condition of reinstatement.

The Board on Professional Responsibility (the "Board") agrees with the Hearing Committee that Respondent's misconduct violated Rule 1.11 and that Bar Counsel has not proven a violation of Rule 8.4(d). We recommend that Respondent be suspended for six months and be required to demonstrate fitness as a condition of reinstatement.

### I. *PROCEDURAL HISTORY*

This disciplinary proceeding was prompted by a complaint filed by counsel for the District of Columbia based on Respondent's disqualification in Ms. Thomas' federal court lawsuit. Bar Counsel filed its Specification of Charges on July 6, 2005. Respondent filed an answer on August 2, 2005, and an amended answer on November 8, 2005. The Hearing Committee conducted six days of evidentiary hearings between December 2005 and April 2006. Bar Counsel filed its Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction on June 1, 2006. After one extension of time, Respondent filed her Opposition to Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction on June 22, 2006. Bar Counsel filed its Reply Brief on June 29, 2006. Following submission of proposed findings of fact and conclusions of law from both Bar Counsel and Respondent, the Hearing Committee heard oral argument regarding the evidence and the proposed sanction from both parties on June 30, 2006.

On April 9, 2007, the Hearing Committee issued its Report and Recommendation (the "Hearing Committee Report"), in which it concluded that Bar Counsel met its burden of establishing a violation of Rule 1.11 but had not established a violation of Rule 8.4(d). The Hearing Commit-

tee recommended a 30–day suspension with a requirement that Respondent demonstrate fitness as a condition of reinstatement. The Hearing Committee did not credit Respondent's testimony on several key points and concluded that the Rule 1.11 violation was not inadvertent. Although the Committee viewed the underlying circumstances as unique, making a recurrence unlikely, it was sufficiently troubled by Respondent's conduct at the hearing and the manner in which she testified that it recommended that Respondent be required to demonstrate fitness as a condition of reinstatement.

On April 17, 2007, Respondent filed objections to the Hearing Committee findings and recommendations, asserting that the findings are not supported by the record, reflect personal opinions and extrinsic matters that were never introduced or entered in this matter, contain misrepresentations of the facts and misstatements of the law, and show that the Hearing Committee failed to consider Respondent's testimony, the testimony of her witness, and the information and documents provided by Respondent.

On April 19, 2007, Bar Counsel notified the Board of its exception to the Hearing Committee's conclusion that Respondent did not violate Rule 8.4(d). Bar Counsel did not except to the Hearing Committee's findings of fact or its conclusion that Respondent violated Rule 1.11. Bar Counsel also did not except to the Hearing Committee's recommendation of a 30–day suspension with the requirement that Respondent demonstrate fitness as a condition of reinstatement.

Under the briefing schedule established by the Office of the Executive Attorney, Respondent's brief was due on May 14, 2007, and Bar Counsel's brief was due within 15 days after service of Respondent's brief. Oral argument before the Board was scheduled for June 21, 2007.

On May 18, 2007, after the close of business, four days after the deadline for Respondent's brief, Respondent hand-delivered a motion to extend the time to file her exceptions until May 24, 2007. The certificate of service attached to Respondent's motion states that a copy of the motion was also hand-delivered to the Office of Bar Counsel. Respondent's motion was not received for filing by the Board until Monday, May 21, 2007, one week after her brief was due. On May 24, 2007, the Board issued an order granting Respondent's motion to file her brief that day and directing Bar Counsel to file its brief within 15 days after service of Respondent's brief. Oral argument before the Board remained scheduled for June 21, 2007. Respondent did not file her brief on May 24, 2007.

On June 5, 2007, the Board issued another order noting that Respondent failed to file her brief, directing Bar Counsel to file its brief within ten days, and requiring Respondent to seek leave if she intended to participate and file a brief in the matter. The order reiterated that oral argument before the Board remained scheduled for June 21, 2007.

On June 15, 2007, Bar Counsel filed its brief in support of the Hearing Committee's conclusion that Respondent violated Rule 1.11 and recommendation that Respondent be suspended for 30 days and required to demonstrate fitness as a condition of reinstatement. Bar Counsel excepted only to the Hearing Committee's failure to find a violation of Rule 8.4(d) (conduct seriously interfering with the administration of justice).

On June 21, 2007, at 2:00 p.m., Respondent failed to appear before the Board for the scheduled oral argument. She instead telephoned the Office of the Executive At-

torney shortly before the oral argument, stating that she thought that she had filed her brief, would be late for the oral argument, and intended to file a motion for leave to submit her brief out of time. When the Board convened to hear oral argument, the Chair of the Board placed this information on the record. Bar Counsel waived its right to present oral argument, and the Board determined that, under Board Rule 13.4(a), Respondent had waived her right to present oral argument based on her failure to file a brief. The case was submitted on the record. Later that day, Respondent hand-delivered a motion to extend the time to file her brief to June 21, 2007 and the time to file her reply brief to June 25, 2007, accompanied by her exceptions to the Hearing Committee Report. In her motion, Respondent stated that she mailed her brief to the Board on May 23, 2007 and enclosed a copy for Bar Counsel but received notice on June 20, 2007 from the Postal Service that her package had been incorrectly addressed and was thus not delivered. In her motion, Respondent also requested that oral argument be rescheduled.

On June 26, 2007, Bar Counsel filed its opposition to Respondent's motion to extend the time to file her brief on the grounds that she failed to present good cause for failure to file a timely brief or to appear for oral argument before the Board. Specifically, Bar Counsel stated that (1) it notified Respondent by telephone on May 31, 2007 that neither the Board nor Bar Counsel had received her brief; (2) the Board's order of June 5, 2007 similarly placed Respondent on notice that her brief had not been received by the Board or Bar Counsel, and (3) Bar Counsel's brief filed on June 15 also noted that Respondent had failed to file a brief, and yet Respondent made no efforts to file her brief prior to June 21, 2007, the date scheduled for oral argument.

On July 2, 2007, notwithstanding Respondent's failure to comply with the Board's briefing deadlines and Bar Counsel's arguments in opposition to Respondent's motion for an extension of time, the Board issued an order accepting Respondent's lodged brief for filing, taking into consideration that Respondent is proceeding *pro se* and to assist in its review of this matter. Given Respondent's "serial failures" to comply with the briefing deadlines, the Board's order denied Respondent's motion to file a rebuttal to Bar Counsel's brief. The Board's order further denied Respondent's request that the oral argument be rescheduled because she failed to present any grounds in support thereof.

On July 12, 2007, Bar Counsel filed its reply brief to Respondent's exceptions to the Hearing Committee Report, restating its recommendation that the Board find that Respondent violated Rules 1.11 and 8.4(d) and adopt the Hearing Committee's recommended sanction of a 30–day suspension with the requirement that she demonstrate fitness as a condition of reinstatement.

## II. *FINDINGS OF FACT*

We have closely examined the record, the detailed and comprehensive Hearing Committee Report, and the briefs and oral argument of Bar Counsel and Respondent before the Hearing Committee, as well as the parties' post-hearing briefs. We conclude that the findings of fact and conclusions of law set forth below, which are drawn in substantial measure from the Hearing Committee Report, are supported by substantial evidence in the record, viewed as a whole. Board Rule 13.7; *In re Micheel*, 610 A.2d 231, 234 (D.C.1992). Pursuant to Board Rule 13.7, we have

made some additional findings, including with respect to post-hearing events, and have summarized and rearranged certain of the Hearing Committee's findings to provide context and further support our conclusions.

A. *Respondent's Employment by the District of Columbia Office of Human Rights*

1. Respondent was admitted to the District of Columbia Bar on July 9, 1999. She is also a member of the Bars of Texas and Maryland. She has no prior disciplinary history. BX A; BX B; Tr. 3/27/06 at 726.[3]

2. On or about November 2000, Respondent began employment with the District of Columbia Office of Human Rights ("OHR"), the District agency with responsibility for assessing claims of employment discrimination. On or about July 10, 2002, she was employed as an Employment Opportunity Specialist Supervisor in OHR's main office. In that position, she was responsible for preparation of legal analyses of potential discrimination claims filed by District residents or employees of the District of Columbia. Tr. 12/13/05 at 38–42; Tr. 3/27/06 at 729–32; BX 2.

3. During the relevant time period, OHR determined whether a claimant stated a valid basis for a discrimination complaint by conducting an investigation (interviewing witnesses, reviewing documents) and evaluating whether the facts supported the legal claim. At the conclusion of its investigation, OHR issued a Letter of Determination ("LOD") setting forth the facts as found by OHR, as well as its legal conclusion about whether the

complainant's charges stated a claim of discrimination. Tr. 12/13/05 at 33–40.

4. Respondent transferred to OHR's main office as of July 8, 2002, at which time she became responsible for supervising OHR investigator Michelle Thomas ("M. Thomas"). *Id.* at 43–44; BX 2 at 2. At the time that Respondent assumed this responsibility, M. Thomas was nearing the end of an investigation regarding an age discrimination complaint filed by Ms. Gladys Graye Thomas ("G. Thomas") concerning her discharge from the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA"). Respondent had no involvement in the G. Thomas matter prior to July 10, 2002. Though acknowledging that the evidence was in dispute as to whether M. Thomas continued to report to her prior supervisor with respect to the G. Thomas matter, the Hearing Committee found that Respondent supervised M. Thomas on the matter after July 10, 2002, when she was concluding OHR's investigation and preparing the LOD. Tr. 12/13/05 at 184; HC Rpt. ¶ 4.

5. M. Thomas testified before the Hearing Committee and identified contemporaneous time records to support her testimony that in July 2002, she provided to Respondent, her new supervisor, a draft LOD concerning the G. Thomas file and that she had received from Respondent comments or edits on the draft. Tr. 12/13/05 at 188–95; RX 12. Respondent testified that she did not review the draft LOD regarding G. Thomas prior to its issuance on August 30, 2002, and submitted several written denials to the same effect. *E.g.,* Tr. 3/27/06 at 795; BX 2 at 2–3; RX 2. Respondent further testified and provided some documentary support for the conclusion that in 2002, when her per-

**3.** "BX" refers to Bar Counsel's exhibits. "RX" refers to Respondent's exhibits. "Tr. x/x/xx" refers to the transcript of the hearings by hearing date. "HC Rpt." refers to the Hearing Committee's Report and Recommendation dated April 9, 2007.

formance at OHR was being reviewed, she specifically disavowed involvement in the review or issuance of the G. Thomas LOD. Tr. 3/30/06 at 988–89; RX 18. If existing copies of Respondent's edits to the draft LOD remain, they were not located or produced during the hearing in this matter. The Hearing Committee credited the testimony and documents provided by M. Thomas over that of Respondent on this issue and found that Respondent reviewed and commented on the draft LOD in July/August 2002. HC Rpt. ¶ 5. Respondent has challenged this finding in her June 21, 2007 exceptions to the Hearing Committee report, arguing that it was improper for the Hearing Committee to credit the testimony of M. Thomas because that testimony was "heavily disputed by Respondent and other witnesses' testimony and numerous documents." Respondent's Brief to the Board ("Respondent's Brief") at 3. Determinations concerning credibility of the witnesses and the weight, value and effect of the evidence "fall primarily within the sphere customarily left to the factfinder...." *In re Temple,* 629 A.2d 1203, 1208 (D.C.1993); *see also Micheel,* 610 A.2d at 234. The Hearing Committee heard the testimony and observed the demeanor of the witnesses and was in the best position to make such determinations. We have considered Respondent's arguments, reviewed the record and have determined that its factual findings with respect to M. Thomas' testimony are supported by substantial evidence in the record.

6. On August 30, 2002, a final LOD was issued to G. Thomas and delivered to her lawyer, Ms. Janet Cooper. The letter was signed by OHR General Counsel, Ms. Julie Lee, on behalf of OHR Interim Director, Ms. Nadine Wilburn. The LOD reflected the agency's determination that there was no probable cause that G. Thomas had been discriminated against on the basis of age when she was terminated from her position with DCRA. The LOD advised G. Thomas that she could file for reconsideration of this finding within 15 days of receipt of the letter. Respondent was identified by name in the LOD as the Equal Opportunity Specialist Supervisor whom G. Thomas should contact if she had any questions about the matter. BX 9.

7. During September and October 2002, after the LOD was issued, G. Thomas made a number of telephone calls and personal visits to OHR regarding her file and the LOD. Respondent participated in at least some of these calls and met with G. Thomas on at least one occasion when G. Thomas visited OHR to review the contents of the investigatory file. Tr. 3/27/06 at 750–55; Tr. 2/15/06 at 423–24. While it is not clear that the two discussed the substance of G. Thomas' age discrimination complaint, the Hearing Committee found that Respondent was aware that G. Thomas believed that documents had been improperly taken out of, or placed into, her employment file which might have affected the outcome of the LOD. HC Rpt. ¶ 7. G. Thomas never filed a formal request for reconsideration but did communicate her concern, orally and in writing to OHR personnel, including Respondent, that OHR had mishandled her file and her case. Respondent also testified that she "verif[ied] with [G. Thomas]" that G. Thomas knew "she had a right to reconsider the case." Tr. 3/27/06 at 754; Tr. 2/15/06 at 455–60; BX 6 at 3–16; RX 2 (email dated Oct. 1, 2002); BX 8o (White affidavit ¶ 26); BX 8t at Ex. 6 and Ex. 7.

8. In January 2003, Respondent was terminated from her position with OHR. Tr. 12/13/05 at 119–20. The termination followed several months of internal discussions about her job performance, as well as

a written performance improvement plan. RX 5. One of the issues raised by OHR supervisors prior to Respondent's termination was the quality and extent of her supervision of other people, including M. Thomas. The Hearing Committee reviewed several e-mails, as well as a lengthy tape-recorded meeting between Respondent and her supervisor, Nadine Wilburn. BX 6. While these materials were not conclusive as to whether Respondent had substantive involvement in the G. Thomas file *prior* to the issuance of the LOD, they demonstrate that Respondent was involved personally and substantially in the G. Thomas matter *after* the issuance of the LOD. The G. Thomas file and how it was handled were central issues in connection with Respondent's evaluations and eventual termination. HC Rpt. ¶ 8; Tr. 12/13/05 at 59–64.

B. *Respondent's Representation of Gladys Thomas*

9. On January 9, 2003, G. Thomas, through her attorney, Ms. Cooper, filed suit in the U.S. District Court for the District of Columbia, alleging that she was a victim of age discrimination in connection with her discharge from DCRA, the same allegation she had made in her earlier complaint filed with the Office of Human Rights. BX 8b.

10. During November 2003, Respondent was contacted by Ms. Cooper, apparently to determine whether Respondent should be a witness in G. Thomas' case against the District of Columbia. BX 4 (fax cover sheet dated November 23, 2004 (note that the date is erroneous and should read "2003")). G. Thomas listed Respondent as a possible witness in her discovery disclosure in the federal court action. BX 8f (discovery disclosure). When she was contacted by Ms. Cooper, Respondent was employed in private practice, specializing in employment discrimination cases. Tr. 3/27/06 at 803–05.

11. Respondent told Ms. Cooper that she should not be a witness in the case because she did not have information about the G. Thomas file, not having been involved in the issuance of the LOD. Respondent did share with Ms. Cooper her recollection of the G. Thomas file. *Id.* at 792–93 ("I [Respondent] told her [Ms. Cooper] that I had no information. Because, first of all, even though I had reviewed portions of the file, there was nothing there. I mean because there was nothing there. I mean there was nothing that was confidential in the file. There was nothing there that I could recall and I had not prepared it. I had not looked at it. I had not looked at the investigation. I had no contact at all with her. The only thing I did was after the fact when Nadine Wilburn questioned me on my analysis of Michelle Thomas' performance.").

12. Respondent and Ms. Cooper proceeded to discuss the possibility of Respondent entering into a "co-counsel" relationship with Ms. Cooper, with the first matter they would work on together being the G. Thomas federal court discrimination suit. *Id.* at 803–05; BX 4 (email dated January 6, 2004).

13. In December 2003, Ms. Cooper asked Respondent to review and edit a significant motion in the federal court action, by which G. Thomas sought reconsideration of the federal court's denial of leave to amend her discrimination complaint to add allegations of sex discrimination. BX 4. The court had previously denied leave to amend, in part because G. Thomas had failed to exhaust her administrative remedies before OHR. The exhaustion issue, in turn, required an examination of the scope of the claim filed with, and investigated by, OHR. Thus, G. Thomas sought to demonstrate in her motion for

 

reconsideration that the way her file had been handled at OHR did not preclude her new effort to amend her complaint to add sex discrimination. BX 8g.

14. Respondent reviewed the draft motion and advised Ms. Cooper that her "analysis appears to be sufficient." BX 4. She also reviewed the legal citations for accuracy. *Id.* The Hearing Committee concluded that, beginning in December 2003, Respondent undertook to act as co-counsel with Ms. Cooper in representing G. Thomas in her federal court suit. HC Rpt. ¶ 12.

15. At the same time, Ms. Cooper also invited Respondent to attend upcoming depositions in G. Thomas' case, including the deposition of M. Thomas, the OHR investigator, whom Respondent supervised. Respondent answered Ms. Cooper's invitation in a document dated December 19, 2003:

> I am also in receipt of your deposition schedule for DCRA's witnesses. I will review my schedule to determine my availability. I agree with you that my attendance at these depositions will allow me to become more familiar with Gladys' ADEA action against DCRA. However, I am puzzled at why you are deposing Michelle Thomas. I am certain that D.C. Government will object to you asking Michelle questions on her investigation of Gladys' complaint under the D.C. Human Rights Act. Michelle was not investigating Gladys case for DCRA or investigating her claim under ADEA. I have concerns about being present during a deposition of Michelle Thomas because (a) my attorney plans to depose Michelle Thomas during my wrongful termination case; and (b) even though I was not involved in the investigation of OHR's No Probable Cause decision in Gladys' case, my name is listed on Gladys Letter of Determination. I

will get back with you with respect to other issues regarding my present [*sic*] or role during the deposition of Michelle Thomas.

BX 4 (fax cover sheet dated December 19, 2003). This document made clear that Respondent was seeking to serve as a lawyer for G. Thomas ("my attendance at those depositions will allow me to become more familiar with Gladys' ADEA action against DCRA").

16. Ms. Cooper likewise invited Respondent to attend the deposition of Bernard Ferguson, one of G. Thomas' supervisors at DCRA, scheduled for January 13, 2004. Respondent testified that she was concerned about attending the deposition because she was not admitted to practice before the U.S. District Court for the District of Columbia. Tr. 4/27/06 at 1332–33. In mid-December, 2003, Respondent made a call to an unnamed representative at the D.C. Bar Ethics Counsel. Tr. 3/27/06 at 825–26. Respondent told the D.C. Bar Ethics Counsel that she had concerns because "someone" wanted her to assist in a case that was in OHR while she was employed at that office. *Id.* Respondent provided a partial description of the relevant facts, but omitted her involvement with the G. Thomas matter after the issuance of the LOD. *Id.* at 817–30; BX 4 (email dated January 6, 2004). Respondent also testified that she had a similar conversation with an unnamed practicing attorney who did not appear before the Hearing Committee (or before the federal court when it considered the District of Columbia's disqualification motion). Tr. 3/27/06 at 825–29; BX 8q.

17. Respondent attended the Ferguson deposition on January 13, 2004. There was a great deal of testimony before the Hearing Committee about the circumstances of the deposition; the role that Respondent played or appeared to play,

including whether she provided questions to Ms. Cooper; and even whether Respondent was introduced at the deposition as one of G. Thomas' lawyers. HC Rpt. ¶ 16. Respondent testified that she attended the deposition merely as an "observer," Tr. 3/27/06 at 831, 848, but also testified that Ms. Cooper may have asked her to review her draft questions in advance of the deposition. *Id.* at 831. The Hearing Committee found that Respondent's conduct during and after the deposition demonstrated that she was functioning as a lawyer assisting Ms. Cooper in the representation of G. Thomas. HC Rpt. ¶ 16; *see supra* ¶¶ 13–14.

C. *Disqualification and Disciplinary Proceedings*

18. Immediately after the Ferguson deposition, Michael Bruckheim, the attorney representing the District of Columbia, contacted Ms. Cooper to complain that Respondent's participation violated Rule 1.11 and that Ms. Cooper herself violated Rule 5.1(c) by allowing that participation. Mr. Bruckheim stated that if Ms. Cooper did not withdraw from representation, he would file a motion to disqualify. When Ms. Cooper refused to withdraw, the District filed a motion seeking to disqualify both Ms. Cooper and Respondent from representing G. Thomas. BX 8k.

19. In opposing the disqualification motion, Ms. Cooper and Respondent each filed affidavits asserting that Respondent had not played a substantive role while at OHR concerning the LOD. BX 8o. Respondent stated that she had not reviewed the draft LOD before it was issued. Both Ms. Cooper and Respondent acknowledged, however, that Respondent played some role in connection with the G. Thomas file. *Id.* Meanwhile, Ms. Cooper and the District sparred over whether the deposition of Bernard Ferguson should be stricken because of Respondent's participation. BX 8o; BX 8p. At no time in opposing the motion to disqualify did either Ms. Cooper or Respondent assert that Respondent was not acting as counsel to G. Thomas and therefore could not be disqualified. BX 8o.

20. In a Memorandum Opinion and Order filed June 29, 2004, U.S. District Court Judge Royce C. Lamberth granted the District's motion to disqualify counsel and struck the deposition of Bernard Ferguson because Respondent's participation tainted the proceedings. BX 8q. Judge Lamberth found that Respondent had a supervisory role while at OHR concerning the G. Thomas case and that Respondent had engaged in some communications at that time with G. Thomas about the OHR process:

> White's former employment at OHR and rapport with the plaintiff as a representative of OHR in her phone conversations with the plaintiff substantially relates to the issues presented in the instant case. Whether or not White satisfied her supervisory responsibilities at OHR and did in fact review Thomas' investigation of the plaintiff's claim prior to the issuance of the Letter of Determination, White did have a substantial responsibility to oversee Thomas's work products.

*Id.* at 10.

21. G. Thomas moved for reconsideration of the Court's order disqualifying her counsel. BX 8r. While that motion was pending, Ms. Cooper died. BX 8u. Respondent was working out of Ms. Cooper's office at the time of Ms. Cooper's death and took over some of Ms. Cooper's files. Tr. 3/30/06 at 927–28. After Ms. Cooper died, G. Thomas urged Judge Lamberth to reconsider his disqualification order with respect to Respondent because she and other "associates" of Ms. Cooper, had to

 

"determine whether they can assist Plaintiff in this matter." BX 8v. Judge Lamberth later denied the motion for reconsideration of his disqualification order, noting that Respondent "cannot now assist [G. Thomas] in this matter." BX 8w.

## III. *CONCLUSIONS OF LAW*

The Hearing Committee determined that Respondent violated Rule 1.11 but that her misconduct did not violate Rule 8.4(d) because the disqualification motion, which was resolved by the presiding judge, "did not trigger any additional or unusual impacts on the case which 'seriously interfered' with the administration of justice." HC Rpt. ¶ T. The Board concurs that Bar Counsel proved by clear and convincing evidence a violation of Rule 1.11 and that no violation of Rule 8.4(d) was proven.

### A. *Rule 1.11(a)*

Rule 1.11(a) states in pertinent part:

A lawyer shall not accept other employment in connection with a matter which is the same as, or substantially related to, a matter in which the lawyer participated personally and substantially as a public officer or employee.

Rule 1.11 serves several distinct but related purposes. It provides assurance to the public that government lawyers will not skew their conduct of official business to gain advantage in subsequent private employment. Similarly, it prevents individuals from seeking to profit at the public's expense by using their government positions to further their private interests later. The rule also ensures that the government as a former client will enjoy the same loyalty and confidentiality to which private clients are entitled. *See generally Brown v. District of Columbia Board of Zoning Adjustment,* 486 A.2d 37, 44–47 (D.C.1984) (en banc) (discussing DR 9–101(B)); D.C. Bar Op. No. 16 (1976) (same); ABA Formal Opinion No. 409 (1997) (discussing Model Rule 1.11). As we explain below, the Board finds that Respondent's subsequent employment on behalf of G. Thomas ran directly counter to these purposes.

The Rule 1.11 inquiry requires resolution of three issues:

(1) Has the lawyer "accepted employment" outside her work as a public officer or employee?

(2) Is the subsequent employment on a "matter which is the same as, or substantially related to" an earlier matter?

(3) Was the earlier matter one in which the lawyer "participated personally and substantially"?

HC Rpt. ¶ A.

The Hearing Committee concluded, and the Board concurs, "that all three elements of the Rule 1.11(a) violation were proved by clear and convincing evidence." *Id.* at ¶ D.[4] "The [Hearing] Committee allowed for extensive questioning of all relevant witnesses by both sides and, in particular, allowed Respondent ample time to present witnesses who might have testimony relevant to the three elements of the Rule 1.11(a) inquiry." *Id.* Further, the Hearing Committee "considered the affidavit testimony provided by the late Ms. Cooper to the federal court in connection with the disqualification motion, as well as the contents of the files provided by Ms. Cooper to Bar Counsel, and which contained

---

**4.** The Hearing Committee made clear that it did not rely solely on Judge Lamberth's findings and conclusions in granting the District's motion to disqualify, but instead reviewed the

evidence independently, including evidence and testimony that was not presented to Judge Lamberth. HC. Rpt. ¶ C.

emails sent by Respondent to Ms. Cooper. The evidence was admitted without objection and was relied upon by" each of the parties. *Id.*

Respondent has excepted to the Hearing Committee's conclusions with respect to each element of the Rule 1.11(a) violation, rearguing her version of events, which the Hearing Committee considered and rejected.[5]

### 1. *"Acceptance of Employment"*

The Board accepts the Hearing Committee's finding, by clear and convincing evidence, "that Respondent accepted employment in connection with the G. Thomas matter during the period late 2003 [through] early 2004." *Id.* at ¶ E. Acceptance of employment does not require a formal retention, nor does it require that the attorney be paid for the work.[6] Rather, the term contemplates only that the attorney has agreed to provide services. *See In re Lieber,* 442 A.2d 153, 156 (D.C. 1982).

Respondent's acceptance of employment is demonstrated by the undisputed evidence that she provided legal services for the benefit of G. Thomas. *See In re Sofaer,* 728 A.2d 625, 629 (D.C.1999) (provision of services evidences acceptance of

employment). She consulted with Ms. Cooper and reviewed draft papers prepared by Ms. Cooper to be filed in G. Thomas' federal court case. She provided substantive and grammatical comments on the drafts and appraised the analysis. She was copied on communications from opposing counsel, BX 1 at 10, and attended a deposition. "Respondent could not provide any reasonable explanation to the [Hearing] Committee about why she was editing legal papers or attending a deposition in the G. Thomas suit if she was not in fact acting as a lawyer for G. Thomas." HC Rpt. ¶ 12; Tr. 4/27/06 at 1321–23.

Respondent demonstrated again and again her contemporaneous understanding that she was acting as counsel to G. Thomas. She expressed concern about participating in the Ferguson deposition because she was not a member of the bar of the federal district court in which the lawsuit was pending. She sought guidance from the D.C. Bar about the effect of the ethics rules on her work on the G. Thomas matter, something that would have been unnecessary if she were not acting as counsel. She advised Ms. Cooper prior to the deposition of M. Thomas that she would "review the Bar's ethical rules to determine what my role should be with respect

---

**5.** Respondent has also presented a new argument—that Rule 1.11(a) does not apply because she was not employed at OHR as an attorney. This argument was not raised before the Hearing Committee, either during Respondent's testimony or in Respondent's post-hearing brief, and we are not obligated to address it. Nevertheless, it is easily rejected on the merits. By its express language, Rule 1.11(a) forbids a lawyer from accepting employment in connection with a matter in which he or she participated personally and substantially "as a public officer or employee." The prohibition does not depend on whether the individual acted as a lawyer for the government or as an officer or employee in a non-legal capacity. *Accord* Annotated

Model Rules of Professional Conduct (6th ed. 2007) at 184 ("Rule 1.11(a) provides that ... a lawyer who has been *employed* (not necessarily as counsel) by the government is disqualified from representing a private client if the lawyer" was *personally and substantially* involved in the matter while working for the government) (emphasis in original).

**6.** Although a compensation agreement is not a *sine qua non* of employment, here there was evidence that Respondent expected to be compensated for her work on the case, albeit in the future, through additional work with Ms. Cooper on other matters. *See* Finding of Fact 12, *supra.*

to questioning Michelle Thomas especially since my name [is] in the Letter of Determination." BX 4 (note dated December 19, 2003). These concerns suggest that Respondent herself thought that she was acting as a lawyer assisting in the representation of G. Thomas.

Her response to the motion to disqualify also demonstrates that Respondent believed herself to be acting as counsel. That motion placed squarely in issue the propriety of Respondent's presence and role at the Ferguson deposition. Respondent and Ms. Cooper each filed a detailed affidavit in opposition to the proposed disqualification, but nowhere did either state that Respondent was not representing G. Thomas. BX 8. But if Respondent were not serving as G. Thomas' lawyer, one would expect that the federal court would have been told that there was no basis to "disqualify" Respondent since she was not acting as counsel. In short, Respondent's protestations that she was an "observer" or even that she was acting in furtherance of her own lawsuit against the District, are simply belied by the evidence of employment. Tr. 3/27/06 at 847–48.

The Hearing Committee correctly discounted the testimony of G. Thomas that she never hired Respondent, never paid her and did not regard Respondent as her lawyer. HC Rpt. ¶¶ 12, F. It was not necessary for Respondent to have contracted directly with G. Thomas in order for Respondent to render services in connection with Ms. Thomas' lawsuit. Ms. Cooper, as G. Thomas' lawyer, enlisted Respondent's assistance. Moreover, as the Hearing Committee noted, the evidence shows that G. Thomas was aware of Respondent's involvement on her behalf and later sought Respondent's assistance

in preparing the motion for reconsideration of Judge Lamberth's order disqualifying counsel. HC Rpt. ¶ F.

### 2. "Same Matter"

Whether a second matter is the same or substantially related to an earlier matter is determined by "a practical [inquiry] asking whether the two matters substantially overlap." *Sofaer*, 728 A.2d at 628. The "same matter" test involves examining "the extent to which the matters involve the same basic facts, related issues, the same or related parties, time elapsed, the same confidential information, and the continuing existence of an important [government] interest." 5 C.F.R. § 2637.201(c)(4) (discussing "same particular matter" under 18 U.S.C. § 207(a)). Two representations involve the same matter if they relate to the same discrete, identifiable transactions or conduct involving a particular situation and specific parties. *See Sofaer*, 728 A.2d at 627; *see also id.* at 643 ("The same issue of fact involving the same parties and the same situation or conduct is the same matter") (Board report adopted by and appended to opinion of D.C. Court of Appeals). Matters are substantially related if it is reasonable to infer that confidential information gained in the course of the first matter would be relevant to the second. *Brown*, 486 A.2d at 49–50 (determining whether counsel for a private real estate developer should be disqualified in zoning proceeding where counsel previously represented the District government in prior transactions relating to the same property); *Sofaer*, 728 at 643–45. The lawyer may rebut this presumption only by showing that the two matters did not overlap. *Brown*, 486 A.2d at 49–50; *Sofaer*, 728 A.2d at 643–45.[7]

---

7. Demonstrating that the lawyer did not actually receive confidential information is unnecessary and irrelevant. *Brown*, 486 A.2d at 49–50; *Sofaer*, 728 A.2d at 644–45. Prior to

The Board concludes that the overlap here was substantial and that the evidence supports the conclusion that the matters were substantially related. An investigation and ensuing litigation centering on the same historical event involving specific parties are the same matter. *Sofaer*, 728 A.2d at 646 (rejecting an argument by the former Legal Advisor to the State Department that the investigation and the criminal litigation regarding the Lockerbie airline bombing were separate matters). The matter before OHR and the lawsuit centered on the termination of Ms. Thomas' employment, a single historical event involving specific parties. *Id.* at 627. G. Thomas' federal court action was based on the same claim of age discrimination that the OHR had investigated. G. Thomas' exhaustion of her administrative remedies within OHR was a precondition to that lawsuit. At the time that Respondent began working on the G. Thomas lawsuit in late 2003, G. Thomas was seeking to amend her age discrimination complaint to add a claim of sex discrimination. The immediate critical question in late 2003 was whether she had exhausted her administrative remedies at OHR on that claim. Respondent was therefore providing legal assistance to G. Thomas on the issue of how Respondent's former employer, OHR, had handled the G. Thomas matter at the time that Respondent had responsibility for the G. Thomas file. As the Board stated in the report adopted by the Court in *Sofaer*, "[i]t would be strange indeed if Rule 1.11(a) permitted a government lawyer to know the confidential course of an investigation into an act, take some responsibility for legal reaction to those events, but then turn around in private practice and represent an alleged perpetrator of those same acts." *Id.* at 647.

Further, Respondent's counsel conceded at the outset of the hearing that it would be an "untenable position" to assert that the two matters were not substantially related within the meaning of Rule 1.11(a). Tr. 12/13/05 at 25–26. In her post-hearing submission to the Hearing Committee, Respondent conceded that "the Gladys Graye Thomas age discrimination complaint under the D.C. Human Rights Act, which was investigated by the District of Columbia Office of Human Rights ("OHR") bear (sic) strong resemblance to the complaint filed by Gladys Graye Thomas in the United States District Court for the District of Columbia under ADEA (Age Discrimination Employment Discrimination Act)." Respondent's Opposition to Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanctions, at 33.

The Hearing Committee correctly concluded that the second factor of the Rule 1.11(a) inquiry was satisfied by clear and convincing evidence.

### 3. *"Personal and substantial participation"*

The third inquiry—whether Respondent participated "personally and substantially" in the prior G. Thomas matter—was the question on which the parties focused most of their argument and evidence. "Substantial participation" means that the employee's involvement must be of significance to the matter or create a reasonable appearance of such significance. *Sofaer*, 728 A.2d at 643. A single act of approving or participating in a critical step may be substantial if the act is of significance to

---

undertaking employment for G. Thomas, Respondent had been identified by G. Thomas as a potential witness in the case, indicating the

parties belief that she had relevant information. BX 8f.

 

the matter. *Id.* at 643. This requires more than official responsibility, knowledge, perfunctory involvement, or involvement in only administrative or peripheral issues. *Id.* at 643 (citing 5 C.F.R. § 2637.201(d)(1)); *see also Whether a Lawyer May Continue to Represent a Client When That Lawyer Represented the Same Client in the Same Matter While Serving as a Public Officer or Employee,* District of Columbia Bar Legal Ethics Committee Opinion 313 (2002).

Respondent contended that, even if she had titular supervisory responsibility for the G. Thomas file at OHR, she did not, in fact, have personal, substantial, material input into the LOD and its conclusions. Respondent sought to show that: (a) the G. Thomas investigation was nearing completion when Respondent transferred into the main OHR office in July 2002; (b) M. Thomas continued to report to a previous supervisor on some matters even after Respondent was appointed her supervisor; (c) the LOD itself was not signed by Respondent; and (d) when issues of Respondent's performance were raised in late 2002, Respondent complained that M. Thomas had sent out the LOD without her prior approval. Although these issues were generally undisputed, Respondent's arguments focused almost exclusively on the G. Thomas file *before* the issuance of the LOD, whereas the G. Thomas "matter" extended further to the subsequent discus-

sions about "reconsideration" of the LOD, removal of materials from the G. Thomas file, and G. Thomas' complaints about OHR. The Hearing Committee correctly determined that for purposes of its inquiry, the G. Thomas "matter" was not concluded with the issuance of the LOD, contrary to Respondent's assertions.

The Board agrees that the record contains clear and convincing evidence that Respondent was personally and substantially involved in the G. Thomas matter while Respondent was employed by the District. As reflected in Finding of Fact No. 5, the Hearing Committee concluded that Respondent reviewed and commented on the LOD before its issuance, that she was given the draft and in fact reviewed it, as M. Thomas testified. The Hearing Committee further concluded that Respondent had access to, reviewed, and was aware of, the contents of the G. Thomas file *after* the issuance of the LOD and communicated directly with G. Thomas regarding "reconsideration" of the LOD decision. *See* Findings of Fact Nos. 7–8; Tr. 3/27/06 at 750–55; Tr. 2/15/06 at 455–60. All the relevant witnesses—Respondent, her supervisor, M. Thomas, and G. Thomas—and all the relevant documents and affidavits confirm that Respondent was actively involved in dealing with the G. Thomas OHR file after issuance of the LOD and not simply in a pro forma capacity as supervisor of M. Thomas.[8]

---

**8.** The Hearing Committee also concluded that for purposes of the Rule 1.11(a) analysis, it is not sufficient to argue, as Respondent appeared to argue, that although she was supposed to be personally and substantially involved in the issuance of the LOD and the follow-up to that LOD, she did not do what she was supposed to do, and therefore she cannot be held responsible for a Rule 1.11(a) violation. The "personal and substantial" test is intended to prevent successive representation by those people who were engaged in a material way on the matter. The lawyer cannot avoid its strictures by claiming that in her subjective view, she did not "feel responsible" for a matter or that she did not act responsibly on a matter for which she was responsible. The Hearing Committee's well supported findings regarding Respondent's active involvement in OHR's handling of the G. Thomas investigation was direct and substantive, not merely administrative, ministerial or peripheral.

## B. *Rule 8.4(d)*

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that seriously interferes with the administration of justice." In *In re Hopkins*, 677 A.2d 55, 60–61 (D.C.1996), the Court explained that to establish a violation of Rule 8.4(d), Bar Counsel must show by clear and convincing evidence that: (1) the lawyer's conduct was improper; (2) the conduct bore directly on the judicial process in an identifiable case; and (3) the conduct tainted the judicial process in more than a *de minimis* way, namely that it must "potentially impact upon the process to a serious and adverse degree." *See also In re Uchendu*, 812 A.2d 933, 940 (D.C.2002).

The Hearing Committee found insufficient proof of a Rule 8.4(d) violation, and Bar Counsel has taken an exception. Bar Counsel urges two theories on which to find a violation: (1) Respondent's time-consuming and ultimately unsuccessful effort to avoid disqualification, requiring the time and attention of the federal court in resolving the motion to disqualify her and in striking the Ferguson deposition [9]; and (2) Respondent knowingly made false statements under oath before the Hearing Committee and the federal court.

We agree with the Hearing Committee that Respondent's violation of Rule 1.11(a) and the corresponding disqualification motion, without more, does not support a finding that the conduct was a serious interference with the administration of justice. Not every action that requires a court to decide a motion interferes with the administration of justice, even though the court expends resources in deciding the matter. *See In re Hallmark*, 831 A.2d 366, 375 (D.C.2003) (holding that the submission of a deficient voucher undoubtedly "placed an unnecessary burden on the administrative processes of the Superior Court and on the presiding judge" but a Rule 8.4(d) violation generally requires "egregious conduct" or "intentional disregard for the effect that an action may have on judicial proceedings."); *see also In re Reynolds*, 649 A.2d 818 (D.C.1994) (per curiam) (violation of conditions of probation in criminal case insufficient to prove violation of DR 1–102(A)(5) (predecessor to Rule 8.4(d)) although hearings had to be held).

Bar Counsel has cited to us no case in which 1.11(a) violation and/or a litigated disqualification motion, standing alone, supported a finding that Rule 8.4(d) was also violated. Such a result would have a pernicious effect on the administration of justice and the representation of individual clients. If the unsuccessful defense of a motion to disqualify were held to constitute sanctionable misconduct, lawyers with meritorious defenses might otherwise withdraw unnecessarily, rather than risk exposure to disciplinary charges. Such a rule would deprive clients of the counsel of their choice and delay proceedings. It could also result in an increase in unfounded disqualification motions for tactical reasons.[10]

---

9. Bar Counsel also submits that Respondent violated Judge Lamberth's disqualification order by secretly continuing to assist G. Thomas. BC Brief to the Board at 28 n. 20. The Hearing Committee believed that Bar Counsel had abandoned this argument, but in any event found no clear and convincing evidence that Respondent violated the order in question. HC Rpt. ¶ R.

10. Judge Lamberth struck the deposition because he concluded that it was "tainted" by Respondent's participation. BX 8q at 12–13 ("White's participation in any aspect of the plaintiff's case conducted by Ms. Cooper taints the plaintiff's deposition [of Ferguson]"). We have carefully considered whether that brings this case within the *Hopkins* standard because it involves more than a sim-

 

In the absence of controlling authority, the Board is not prepared to find under these circumstances that the disqualification of an attorney, even if accompanied by the striking of a deposition, interferes sufficiently with the administration of justice to violate Rule 8.4(d).

Bar Counsel next contends that Respondent knowingly gave false testimony before the Hearing Committee and before the federal court in connection with the motion to disqualify. This argument is based on Respondent's inconsistent statements and conflicts between her testimony, the testimony of others and documentary evidence. The Hearing Committee made it clear that they did not find Respondent credible and that they believed the testimony of others where the two were in conflict. HC Rpt. at 23. Overall, the Hearing Committee found "that Respondent's testimony was not credible on the key issues in this case, particularly her involvement in the G. Thomas file—both before and after the issuance of the LOD—and the steps she took to inform herself of her proper ethical duty when she was contacted by Ms. Cooper in late 2003." *Id.* Although the Hearing Committee expressed misgivings, it explicitly declined to find that Respondent lied ("While the Committee has not concluded that Respondent lied to the Committee, Respondent's testimony did not support a clear and con-

sistent defense to the serious charges."). *Id.* A fact-finder may credit the testimony of one witness over that of another without concluding that the second is lying. The Board defers to the Hearing Committee's express refusal to find that Respondent lied.[11]

## IV. SANCTION

The Hearing Committee has recommended a thirty-day suspension with the requirement that Respondent demonstrate fitness as a condition of reinstatement. Bar Counsel also recommends that Respondent be suspended for thirty days and that she be required to demonstrate fitness as a condition of reinstatement. Respondent argues that no sanction should be imposed because she did not engage in any misconduct.

We believe that this Rule 1.11 violation warrants a longer suspension. In addition, the conduct is aggravated by the dishonesty displayed by Respondent in her dealings with the Board. We concur in the Hearing Committee's recommendation that Respondent should be required to demonstrate fitness as a condition of reinstatement.

### A. *Length of Suspension*

The appropriate sanction for a violation of the disciplinary rules is one that is (a) necessary to protect the public and the

---

ple disqualification. But requiring an attorney to stake his disciplinary status on the remedy ultimately imposed by a judge who grants a motion to disqualify creates the same, if not a greater, chilling effect on defending such a motion. Such a holding would invite requests for such a remedy for tactical reasons.

11. The Board must "accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole." *Micheel,* 610 A.2d at 234 (quoting *In re Thompson,* 583 A.2d

1006, 1008 (D.C.1990)); *see also* Board Rule 13.7 (giving the Board the authority to "affirm, modify or expand the findings and recommendation of the Hearing Committee" when not supported by substantial evidence in the record). Such deference to the Hearing Committee's factual findings and credibility determinations is especially heightened where the determinations are based on direct observation of the Respondent. *See In re Anderson,* 778 A.2d 330, 341–342 (D.C.2001); *Temple,* 629 A.2d at 1208–09.

courts, (b) necessary to maintain the integrity of the profession, and (c) necessary to deter other attorneys from engaging in similar misconduct. *Uchendu,* 812 A.2d at 941 (quoting *In re Reback,* 513 A.2d 226, 231 (D.C.1986) (en banc)). The disciplinary process must consider, among other factors, the nature and seriousness of the misconduct, whether the conduct involved dishonesty, the harm to the client and other parties, prior discipline, acceptance of responsibility by the attorney, and mitigating factors. *In re Jackson,* 650 A.2d 675, 678 (D.C.1994) (per curiam) (appending Board Report). While each case is decided on its own facts, the sanction should be supportable in light of the reasons for the sanction and meet the requirement of D.C. Bar R. XI, § 9(h)(1) of consistent sanctions for comparable conduct. *See In re Romansky,* 938 A.2d 733, 743 (D.C.2007) (quoting *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc)).

In considering the proper sanction for a Rule 1.11 violation, the Board, like the Hearing Committee, has little precedent to guide us. In *Sofaer,* the sanction was an informal admonition for a violation that was "one of omission," when a lawyer with "exemplary 30–year legal career" failed to inform himself of the strictures of Rule 1.11(a) and promptly withdrew when the rule was brought to his attention. 782 A.2d at 652. Moreover, the respondent in *Sofaer* undertook the private representation because he believed that his work for Libya in pursuing a consensual resolution of claims related to the Lockerbie bombing would serve an important national interest. Finally, *Sofaer* was a case of first impression, and the respondent had substantial and good faith arguments concerning the application of Rule 1.11(a). Under the unique circumstances there presented, a more serious sanction was not warranted. 728 A.2d at 653.

All conflicts of interest are serious breaches of the Rules of Professional Conduct. *See, e.g., In re Long,* 902 A.2d 1168, 1172 (D.C.2006) (per curiam) (thirty-day suspension for well-intentioned conduct that resulted in a conflict of interest, without dishonesty). Conflicts of interest involving former government employees are especially serious because of the strong public interest in preserving the proper functioning of government and the public's faith therein. Rule 1.11 differs from the conflict of interest rules that govern private lawyers because of these special considerations. Unlike most other conflicts of interest, those arising from former public employment cannot be waived. In this, the District of Columbia's version of Rule 1.11 differs from the ABA Model Rule, reflecting our Court's judgment that a former public servant should never be allowed to do what Respondent did here. The prohibitions of Rule 1.11 are not limited to side-switching; they apply even if the former public employee espouses the same position in private practice as she did as a public official. The Rule reflects the commonsense notion that the conduct of former public employees implicates the public interest to a greater extent than does conduct involving private parties. *Sofaer,* 728 A.2d at 644 (citing *Brown,* 486 A.2d at 48–50).

Outside the context of former government employees, sanctions for conflicts of interest have run the gamut from public censure through disbarment, with more severe sanctions associated with greater harm (or potential harm) to the client and lawyer dishonesty. *See, e.g., In re James,* 452 A.2d 163 (D.C.1982) (two-year suspension for two cases, one involving conflict of interest and the other involving dishonesty resulting from conversion of funds being

held to pay third-party claims); *In re Shay,* 756 A.2d 465 (D.C.2000) (per curiam) (Board report appended) (ninety-day suspension for conflict of interest). The ABA's Model Standards for Imposing Lawyer Sanctions, while not binding on the Board, suggest that "Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." ABA Model Standard 4.32. In *In re Ponds,* 888 A.2d 234, 246–47 (D.C.2005), the Court imposed a thirty-day suspension on a lawyer found responsible for a conflict of interest violation in the absence of evidence of dishonesty or fraud. *See also In re Butterfield,* 851 A.2d 513 (D.C.2004) (per curiam) (thirty-day suspension for failure to run conflicts check or to deal with conflict once raised); *Long,* 902 A.2d at 1168 (thirty-day suspension for violation of conflict of interest rules and duty of competence); *In re Boykins,* 748 A.2d 413 (D.C.2000) (per curiam) (thirty-day suspension for conflict of interest and related violations).

Here, Respondent's dishonesty is a substantial aggravating factor. See *In re Chapman,* 962 A.2d 922, 924–926 (D.C. 2009) (per curiam) (false testimony and/or statements to Bar Counsel substantial factor in aggravation of sanction) (collecting cases). As recounted in the Procedural History section of this Report, Respondent claimed before the Board that she mailed her brief in this matter to the Board on May 23, 2007 (after she had missed the original filing deadline and received an extension until May 24) and enclosed a copy for Bar Counsel but learned only on June 20, 2007 from the Postal Service that her package had been incorrectly addressed and was thus not delivered. However, the Board and Bar Counsel notified Respondent on several occasions prior to June 20 that her brief had not been received. In particular, (1) Bar Counsel notified Respondent by telephone on May 31, 2007 that neither the Board nor Bar Counsel had received her brief; (2) the Board's order of June 5, 2007 similarly placed Respondent on notice that her brief had not been received by the Board or Bar Counsel; and (3) Bar Counsel's brief filed on June 15 also noted that Respondent had failed to file a brief. Particularly in the context of her many procedural defaults, we conclude that Respondent's excuse for her failure to file her brief was dishonest. In filing pleadings containing these dishonest statements, Respondent violated Board Rule 18.8(e) (signature on pleading constitutes a certificate that the contents are true as stated).

We note as a mitigating circumstance that Respondent has no prior disciplinary record.

The combination of these two factors— the seriousness of this revolving door conflict and Respondent's dishonest excuses in conducting her defense—warrant a substantial suspension. We believe that a suspension of six months strikes an appropriate balance.

### B. *Proof of Fitness*

In *In re Cater,* 887 A.2d 1, 24 (D.C. 2005), the Court stated that a fitness requirement is appropriate where "there is clear and convincing evidence that casts a serious doubt [on] the attorney's continuing fitness to practice law." Such a requirement "is intended to be an appropriate response to serious concerns about whether the attorney will act ethically and competently in the future, after the period of suspension has run." *Id.* at 22.

In determining whether serious doubt is raised about a respondent's fitness to practice law, it is instructive to consider the

*Roundtree* factors used for evaluating petitions for reinstatement. *Id.* at 21.[12] Here, the nature and circumstances of the misconduct were serious—the violation is one that undermines public confidence in public servants, and it was not inadvertent. Respondent was aware of the conflict issue when she undertook the representation of G. Thomas and made, at most, a half-hearted attempt to obtain ethical guidance. Indeed, the only evidence that Respondent sought any guidance at all was her own testimony regarding a call to an unnamed representative of the Bar, in which Respondent provided only a partial description of the relevant facts (omitting Respondent's substantial involvement with the G. Thomas matter after issuance of the LOD), and a call with a practicing attorney who never appeared before the Hearing Committee or before the federal court when it considered the District of Columbia's disqualification motion. Although the circumstances of the misconduct alone may not justify the imposition of a fitness requirement, we are amply satisfied that Respondent's actions in the disciplinary process, implicating the second through fifth *Roundtree* factors, provide clear and convincing evidence of a serious doubt regarding Respondent's continuing fitness to practice law.

Second, the Board concludes that Respondent does not appreciate the seriousness of her misconduct. Respondent made false statements to the Board, the truth of which she certified, in seeking to excuse her failure to file her brief in a timely fashion. When Bar Counsel challenged those statements as false, she did not deny the allegation and made no response. Respondent's cavalier and dishonest conduct in responding to this disciplinary proceeding strongly suggests a failure to understand the wrongfulness of her conduct and an unwillingness to meet her obligations to the disciplinary system. *In re Cleaver–Bascombe,* 892 A.2d 396, 412–413 (D.C. 2006).

Further, the Hearing Committee found that Respondent displayed significant visible and audible contempt during the disciplinary proceedings. Although the cold record cannot completely demonstrate the conduct, the Hearing Committee painted a vivid picture:

> Despite her able counsel's efforts, Respondent was dismissive of the proceeding and visibly contemptuous of witnesses who testified adversely to her position. She scoffed, harrumphed, and audibly sighed at testimony she did not like while smirking at the testimony of others. Tr. 3/30/06 at 1005–1006, 1010; Tr. 4/27/06 at 1359, 1381–1382.

HC Rpt. ¶¶ VII; XIII(d). The Chair admonished her on several occasions.

As the Hearing Committee recounted, the record clearly demonstrates Respondent's failure to acknowledge the wrongfulness of her conduct. Further, Respondent's unprofessional behavior during the disciplinary process shows that she does not recognize her obligations to the Court and its system of regulating attorney conduct. Her repeated defaults and her fail-

---

**12.** Five factors are considered in determining whether a suspended or disbarred attorney has met the criteria necessary for reinstatement:

(1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps taken to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualifications and competence to practice law.

*In re Roundtree,* 503 A.2d 1215, 1217 (D.C. 1985).

ure to appear for oral argument are red flags. The Court of Appeals has recently held that serious doubt about a lawyer's fitness to practice can arise from her conduct in the disciplinary process, even if she has participated to some degree in the proceedings. *See In re Lea,* 969 A.2d 881 (D.C.2009). In this case, the Hearing Committee and the Board may properly infer that Respondent lacks contrition and fails to appreciate the seriousness of her conduct based on her conduct and tone at the hearing, lack of credibility, and procedural defaults, including her failure to appear at oral argument, failure to file her brief on schedule and dishonest explanation regarding that failure to file. *See id.* at 887–88.

Third, as the Hearing Committee noted, one of Respondent's first forays into private practice was the matter that resulted in this disciplinary proceedings. Given her "ethical numbness," [13] we have substantial doubt that Respondent will, when again confronted with an ethics issue, correctly identify it, seek appropriate guidance and avoid a self-interested result. As the Hearing Committee observed:

> Having spent many hours with Respondent and having observed her demeanor, her conduct, and the manner in which Respondent views her professional responsibilities, the Committee concludes that the public is at risk from Respondent's unsupervised practices.

HC Rpt. ¶ XII.

In short, Respondent has given us many reasons to doubt her fitness to practice law. Her conduct in this matter does not demonstrate the ethical sensitivity required for practice, and Respondent is a prime candidate for future problems if the Bar does not intervene at this juncture.

**13.** HC Rpt. ¶ XII, *citing In re Hager,* 812 A.2d 904, 921 (D.C.2002).

## V. CONCLUSION

For all the foregoing reasons, the Board finds that L. Saundra White violated D.C. Rules of Professional Conduct 1.11 and recommends that she be suspended for a period of six months and be required to demonstrate fitness as a condition of reinstatement.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /DJJ/
Deborah J. Jeffrey

Date: August 20, 2009

All members of the Board concur in this Report and Recommendation except Mr. Mercurio and Mr. Bolze, who have filed a separate statement concurring in part and dissenting in part.

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: L. SAUNDRA WHITE, Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 463929)

Bar Docket No. 292–04

### STATEMENT OF MEMBER JAMES P. MERCURIO

### CONCURRING IN PART AND DISSENTING IN PART

I agree that the record in this matter, as the majority concludes, supports the Hearing Committee's finding that Respondent, by accepting employment in connection with the federal civil action Gladys Graye Thomas ("Thomas") filed against the Dis-

trict of Columbia violated Rule 1.11. But in my view the record establishes that Respondent violated Rule 8.4(d) as well.

Rule 8.4(d) provides that "[i]t is professional misconduct for a lawyer to ... [e]ngage in conduct that seriously interferes with the administration of justice." In its 1996 decision in *In re Hopkins*, 677 A.2d 55 (D.C.1996), the Court prescribed three criteria for determining whether attorney conduct violates that rule. "[T]he conduct must be improper," it "must bear directly upon the judicial process (*i.e.*, the administration of justice) with respect to an identifiable case or tribunal" and it must "taint the judicial process in more than a *de minimis* way; that is, at least potentially impact upon the process to a serious and adverse degree." *Id.* at 60–61.

The majority report states the *Hopkins* criteria (*ante*, at 1247), but then makes no serious effort to determine whether they have been met in this matter. Instead, it casts *Hopkins* aside and announces agreement "with the Hearing Committee that Respondent's violation of Rule 1.11(a) and the corresponding disqualification motion, without more, does not support a finding that the conduct was a serious interference with the administration of justice." *Ante*, at 1247. As support for this unprecedented exception to the long-followed *Hopkins* opinion, the majority points out that "Bar Counsel has cited to us no case in which [a] 1.11(a) violation and/or a litigated disqualification motion, standing alone, supported a finding that Rule 8.4(d) was also violated." *Id.*

Ordinarily, the absence of contrary authority would mean that a court's previous holding should be followed, and in this matter the *Hopkins* precedent would be dispositive. The majority protests, however, that finding a violation of Rule 8.4(d) in this matter "would have a perni-

cious effect on the administration of justice and the representation of individual clients." *Id.* To explain this supposed "pernicious effect," the majority warns that "[i]f the unsuccessful defense of a motion to disqualify were held to constitute sanctionable misconduct, lawyers with meritorious defenses might otherwise withdraw unnecessarily, rather than risk exposure to disciplinary charges." *Id.* The majority's position thus is based on an unlikely supposition that there exist a significant number of timorous trial lawyers who might "withdraw unnecessarily" if faced with mere "*exposure* to disciplinary charges." *Id.* (emphasis added).

The majority's argument collides with its own finding that Respondent violated Rule 1.11. That finding illustrates the plain fact that "unsuccessful defense of a motion to disqualify" is already quite likely to lead to, if not guarantee, a disciplinary sanction under Rule 1.11. The majority's position thus ultimately must rest on the unproven speculation that trial lawyers in appreciable numbers, while willing to undertake a representation that could result in a disciplinary sanction for violation of Rule 1.11—the almost certain consequence of their disqualification for a public employee conflict of interest—would cower away from the same representation if a charge of interference with the administration of justice might be brought against them. Speculation of that kind is hardly reason to carve out an exception to the well-settled *Hopkins* test for Rule 8.4(d) violations.

Respondent's misconduct under Rule 1.11 satisfies the first *Hopkins* criterion—improper conduct. In the circumstances of this matter, that misconduct also meets the second criterion, because it "bear[s] directly upon" the administration of justice in Thomas' federal action against the Dis-

trict of Columbia.[14] Whether the record establishes a Rule 8.4(d) violation thus turns on the third *Hopkins* criterion—"taint the judicial process in more than a *de minimis* way; that is, *at least potentially* impact upon the process to a serious and adverse degree." *Hopkins*, 677 A.2d at 61 (emphasis added). Bar Counsel, in support of his contention that the required "taint" has been established, maintains that "[t]he record in this disciplinary action reveals" the following with regard to Respondent's participation in Thomas' federal action:

> Respondent's sharing with [Janet] Cooper [Thomas' lawyer in her federal lawsuit] her recollection of the OHR investigation, as well as OHR internal documents and an audio tape of Respondent's meeting with [Michelle] Thomas while they were both employed at OHR.
>
> [Her] reviewing and editing the brief that Cooper filed with the federal court in December 2003, the thrust of which was that OHR had improperly investigated and handled Gladys Graye Thomas' matter—the very same matter in which Respondent had been personally

and substantially involved as an OHR supervisor.

Bar Counsel's Brief at 27.[15]

The conduct Bar Counsel has described appears to involve the kind of disclosures of confidential information that Rule 1.11(a) was adopted to forestall. In *Brown v. District of Columbia Board of Zoning Adjustment*, 486 A.2d 37 (D.C.1984) (en banc), the Court held that one of the "three improprieties" addressed by the predecessor to Rule 1.11(a) is that "[t]he lawyer . . . may disclose confidential information to the prejudice of the government client." *Id.* at 47. It therefore is necessary to determine whether the record establishes that Respondent's misconduct involved or potentially involved disclosure of confidential information and thereby "taint[ed] the judicial process in more than a *de minimis* way" or "*at least potentially* impact[ed] upon the process to a serious and adverse degree." *Hopkins*, 677 A.2d at 61 (emphasis added).[16]

The Hearing Committee report has no discussion of the *Hopkins* criteria in the section headed "Rule 8.4(d)" in its Proposed Conclusions of Law. *See* HC Rep. at 20–22. But among its findings under the heading

---

**14.** The formal title of Gladys Thomas' action is *Thomas v. District of Columbia*, Civ. Dkt. No. 1:03–cv–00032–RCL (filed Jan. 9, 2003). The case was assigned to District Court Judge Royce C. Lamberth. For convenience, the action will simply be referred to as "Thomas' federal action" in the remainder of this statement.

**15.** "Michelle Thomas" is the OHR employee who investigated Gladys Graye Thomas' case. To avoid confusion between Michelle Thomas and Gladys Graye Thomas, I will simply refer to Michelle Thomas as "the OHR investigator in Thomas' case," and not by her name.

**16.** Bar Counsel also relies upon findings stated in the District Court's Memorandum Opinion issued in Thomas' federal action with the disqualification order. Judge Lamberth,

however, for purposes of the motion he decided, placed the ultimate burden of proof on Respondent. As he held, once a *"prima facie"* showing is made by the defendant, [Respondent] must disprove the existence of any ethical impropriety by showing that she could not have gained access to information that might be useful in the representation of the plaintiff in this case." BX 8q at 10. That burden is contrary to the "clear and convincing evidence" burden that Bar Counsel must meet in disciplinary cases. Because of this reversal of the burden of proof, the Hearing Committee, rightly in my view, decided that it would not rely "on Judge Lamberth's conclusions about the evidence in deciding this ethics matter." HC Rep. at 22.

"Respondent's Representation of Gladys Thomas," the Committee finds that "beginning in December 2003, Respondent undertook to act as co-counsel with [Janet] Cooper in representing G. Thomas in her federal court suit." *Id.* at 7–8.[17] In that finding, the Committee explained as follows:

G. Thomas initially filed suit alleging age discrimination but later sought to amend her complaint to allege sex discrimination as well. The federal court denied the requested amendment, in part[,] because G. Thomas had failed to exhaust her administrative remedies before the OHR. The exhaustion issue, in turn, required an examination of the scope of the claim filed with, and investigated by, OHR. Thus, as of November 2003, G. Thomas was poised to file a motion for reconsideration with the federal court to demonstrate that the way her file had been handled at OHR did not preclude her new effort to amend her complaint to add sex discrimination.

*Id.* at 8.

Cooper, on December 19, 2003, filed that motion for reconsideration, in which she contended that, during the OHR investigation, Thomas expressed interest in adding a sex discrimination claim to her OHR complaint (which, as filed, only alleged age discrimination), but that the investigator on her case did not follow OHR regulations, which she claimed "dictate[d] that upon a request from the Complainant or from information discovered during the investigation, either an intake officer or an investigator must amend a complaint." BX 8g at 4. Cooper sent Respondent a

draft of that motion, which Respondent reviewed and advised Cooper, in a faxed memorandum, that her "analysis appears to be sufficient." HC Rep. at 8 (citing BX 4). In addition, while Respondent's memorandum disclaimed any knowledge about Thomas' sex discrimination claim and cautioned that "[i]t has been over a year since I recall skimming through Gladys' file," she nonetheless wrote that "I do not recall reviewing any amended complaints" and went on to express to Cooper her belief "that the statements ... that you mentioned in the Motion will probably be sufficient on the issue of the exhaustion of remedies." BX 4.[18]

Other evidence that Bar Counsel urges in support of its 8.4(d) charge has to do generally with Respondent's "sharing with Ms. Cooper her recollection of the OHR investigation, as well as OHR internal documents and an audio tape of Respondent's meeting with M. Thomas while they were both employed at OHR." Bar Counsel's Brief at 27. Bar Counsel requested the Hearing Committee to adopt the following finding on this subject:

Sometime after sending Cooper her memo of November 23, 2003, Respondent gave Cooper tapes that she had made of her meetings with [the OHR investigator in Thomas' case] while employed at OHR.

Bar Counsel's Proposed Findings of Fact, Conclusions of Law, and Recommendation as to Sanction at 17.

Respondent in her testimony acknowledged that pages 3 and 4 in BX 4 replicate a memorandum she sent to Cooper on November 23, 2003.[19] Tr. V at 1144–45.[20]

---

**17.** Janet Cooper was Thomas's attorney both during the OHR consideration of her complaint and in Thomas's federal action.

**18.** The "statements" Respondent refers to are three affidavits that Cooper filed in support of

the motion for reconsideration. *See* BX 8g Exs. A–C.

**19.** The exhibit is actually dated November 23, 2004, but its contents and the context in which it was written show that it was 2003,

In that memorandum, Respondent wrote, "I believe that I have a tape whereby I questioned [the OHR investigator · in Thomas' case] on why she failed to interview [Gladys Thomas'] witnesses or review Gladys' or similarly situated employees['] evaluations." BX 4 (November 23, 2003 memorandum). When asked, Respondent testified that she "provided Ms. Cooper with a copy of [that] tape . . . ." Tr. V at 1145.

In sum, the Hearing Committee found that, "beginning in December 2003 Respondent undertook to act as co-counsel with Ms. Cooper in representing G. Thomas in her federal court suit." HC Rep. at 7–8. What is more, Respondent showed a willingness and an ability at that time to impart OHR confidential information to Cooper and Thomas. She actually gave them her recollection about Thomas' OHR investigation file and a tape recording of her interview of the OHR investigator in Thomas' case who investigated, or failed to investigate, matters Thomas complained about. These facts establish, by clear and convincing evidence, that Respondent was teamed up with Cooper to pursue discrimination claims in the United States District Court for the District of Columbia that were virtually identical to claims that OHR had considered. As a practicing private lawyer who would share the credit if Thomas were successful in her federal action, Respondent in December 2003 had both professional and practical incentives to continue sharing with Cooper and Thomas whatever information she might have obtained as an OHR supervisor who personally and substantially participated in OHR's consideration of Thomas' claims. Respondent's own testimony and the two

memoranda in BX 4 quoted above provide examples of the information she gave to Cooper and Thomas. In neither memorandum does Respondent betray any feeling that it would be unethical for her to continue to provide information she had learned during her OHR employment as it became relevant to the issues in Thomas' federal action. Respondent's misconduct thus threatened to give Thomas and Cooper a significant and unfair advantage over their adversaries in Thomas' federal action and thus posed, at the very least, a "potential impact upon the process [in that lawsuit] to a serious and adverse degree." Accordingly, in my· view, Respondent's conduct violated Rule 8.4(d), as well as Rule 1.11(a).

/JPM/

James P. Mercurio.

Dated: August 20, 2009

Mr. Bolze joins in this separate Statement.

### APPENDIX B

## DISTRICT OF COLUMBIA COURT OF APPEALS

## BOARD ON PROFESSIONAL RESPONSIBILITY

In the Matter of: LUCILLE SAUNDRA WHITE, (aka Lucille Parrish, Saundra Parrish, or Saundra White) Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 463929)

Bar Docket No. 169–06

*AMENDED REPORT AND RECOMMENDATION OF THE BOARD ON PROFESSIONAL RESPONSIBILITY*

Hearing Committee Number Nine has recommended Respondent's disbarment

---

rather than 2004 when the memorandum was sent.

**20.** "Tr. V" refers to the transcript of the hearing held on March 30, 2006.

for the submission of fabricated evidence and false testimony in a matter before the District of Columbia Council, as well as the presentation of false evidence and misrepresentations that pervaded her defense in the disciplinary hearing. Neither party has filed an exception.[21]

The Board agrees that Respondent should be disbarred for her deliberately dishonest conduct that "creat[ed] an unbroken chain of deceit and misrepresentation that ran all the way through [the Hearing] Committee's proceedings." HC Rpt. at 36. The Hearing Committee's Findings of Fact are supported by substantial evidence in the record, and there is clear and convincing evidence that her conduct violated D.C. Rules of Professional Conduct 3.4(a) (alteration of evidence); 3.4(b) (falsification of evidence and false testimony); 8.1(a) (false representation in connection with a disciplinary matter); 8.4(b) (criminal act—here, perjury—that reflects adversely on the lawyer's honesty, trustworthiness or fitness); 8.4(c) (dishonesty, fraud, deceit or misrepresentation); and 8.4(d) (serious interference with the administration of justice).

As detailed by the Hearing Committee, the key facts may be summarized as follows:

In 2001, the Director of the Office of Human Rights ("OHR"), Charles Holman, initiated steps to terminate Respondent's employment as head of the office's investigative unit. In response, Respondent filed two whistleblower complaints with the District of Columbia's Office of Inspector General ("OIG"). In neither investigation did Respondent complain about contracts between OHR and the law firm Curtis Lewis & Associates ("CLA").

Respondent was fired by Mr. Holman's successor in January 2003. Shortly thereafter, she read allegations in the press that Mr. Holman had been ordered by the head of the Washington Teachers' Union to improperly steer OHR contracts to CLA. She then falsely reported to D.C. Council Member Vincent Orange that she had objected to OHR's contracts with CLA[22] and suffered retaliation as a result, corroborating those claims with fabricated documents purportedly submitted to OIG in 2001. She repeated these false allegations in testimony before the D.C. Council on two occasions and accused OIG personnel of lying under oath when they contradicted her. Council Member Orange and others relied on Respondent's purported evidence in seeking removal of Inspector General Charles C. Maddox. HC Rpt. at 15–16, 19, 20–21, ¶¶ 48, 58, 62–63.

Respondent did not testify before the Hearing Committee, but in her oral argument and written submissions, she sponsored as genuine multiple documents that the Hearing Committee determined to be fabricated. As the Hearing Committee explained, the fabrications were clumsy and obvious, *e.g.*, a memorandum purportedly addressed by Respondent to OIG investigator Denmark Slay some ten days before

---

21. Respondent is currently suspended on an interim basis pursuant to D.C. Bar R. XI, § 9(g), based upon the Board's August 20, 2009 recommendation of a six-month suspension, with reinstatement conditioned on proof of fitness, in another matter pending before the Court. *See In re White*, Bar Docket No. 292–04 (BPR Aug. 20, 2009) (finding that Respondent violated Rule 1.11 by representing a client in a matter in which she had participated personally and substantially while employed at the District of Columbia's Office of Human Rights ("OHR")).

22. Not only did Respondent not object to the retention of CLA, she recommended orally and in writing that OHR contract with the firm. HC Rpt. at 3–4, ¶¶ 6–8.

 

he was assigned to investigate her complaint. HC Rpt. at 13–15, ¶¶ 43–46.

The Hearing Committee found that Respondent was not credible and engaged in deliberate dishonesty: "[S]he made false statements and presented false documents to the City Council and presented false documents to the Committee and made misrepresentations in her pleadings to the Committee." HC Rpt. at 27, ¶ 79.

For the reasons stated in the Hearing Committee's report, which we adopt and append hereto, the Board recommends that Respondent be disbarred.[23]

BOARD ON PROFESSIONAL RESPONSIBILITY

By: /DJJ/
Deborah J. Jeffrey

Dated: July 1, 2010

All members of the Board concur in this Report and Recommendation except Mr. Willoughby, who is recused, and Mr. Smith, who did not participate.

DISTRICT OF COLUMBIA
COURT OF APPEALS

BOARD ON PROFESSIONAL
RESPONSIBILITY

HEARING COMMITTEE
NUMBER NINE

In the Matter of: LUCILLE SAUNDRA WHITE, (aka Lucille Parrish, Saundra Parrish, or Saundra White) Respondent.

A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 463929)

Bar Docket No. 169–06

*REPORT AND RECOMMENDATION OF HEARING COMMITTEE NUMBER NINE*

## I. PROCEDURAL BACKGROUND

Bar Counsel served Respondent with initial charges on April 25, 2008. Respondent filed an answer on May 15, 2008. Amended charges were filed on November 5, 2008. Respondent did not file an answer to the amended charges.

Bar Counsel charged Respondent with violating D.C. Rules of Professional Conduct (the "Rules") 3.4(a), 3.4(b), 8.1(c), 8.4(b), 8.4(c), and 8.4(d). The charges arose from Respondent's "whistleblower" claims of steering of government contracts by the Mayor's office to favored contractors; her dealings with investigators from the Office of Inspector General investigating those claims; alleged falsification of documents and perjury when Respondent testified to her whistleblower claims before the D.C. Council; and additional dishonesty within the disciplinary system.

A hearing was held over six days—September 4 and 5, 2008, November 5 and 24, 2008, and January 5 and 6, 2009—before Hearing Committee Number Nine composed of Richard H. Sinkfield, III, Esquire, Chair; Ms. Twanna Rene Price; and Jack McKay, Esquire. Bar Counsel called seven witnesses: Charles Holman, the former Director of OHR; Christopher Adoleye, a former law clerk for Bar Counsel; George Scavdis, a former OIG Special Agent; Jason Grimes, former Director of Investigations at OIG; Barbara Delaney, a former OHR employee; Denmark Slay, an OIG Special Agent; and Robert Mancini, Program Manager for the D.C. Office of the Chief Technology Officer ("OCTO").

---

**23.** On May 18, 2010, Bar Counsel filed a Motion to Expedite Consideration of Hearing Committee No. Nine's Report and Recommendation. Bar Counsel's motion is hereby dismissed as moot.

Bar Counsel offered Bar Counsel's Exhibits ("BX") 1–59 into evidence during the hearing. The Committee admitted all Bar Exhibits on November 24, 2008, before BX 57–59 were offered. Exhibits 57–59, to which there was no objection, are admitted. In aggravation of the sanction, Bar Counsel offered four additional exhibits, BX 60–63, relating to another disciplining matter involving Respondent and court orders relating to Respondent's conduct as counsel for clients. Respondent has objected to Bar Counsel's exhibits in aggravation and to BX 64, an affidavit of Charles Maddox. Those exhibits will be admitted.

Respondent, who represented herself at the hearing, called four witnesses: Laurie Bay, a former colleague; Tracey Williams, a D.C. employee who shared office space with Respondent; Georgia Stewart, an OHR employee; and Vincent Orange, a former member of the D.C. Council. Respondent chose not to testify on her own behalf. However, the Respondent did make factual assertions in pleadings and directly to the Committee. The Committee admitted Respondent's Exhibits ("RX") 1–20. Tr. at 1121. After the hearing, Respondent sought to offer additional exhibits. (RX 21–24) Bar Counsel has objected to the admission of all but one of her additional exhibits, i.e., RX 22. Respondent's additional exhibits will be admitted.

## II. FINDINGS OF FACT

### A. *Respondent's Bar Membership and Employment by OHR*

1. Respondent was admitted to practice law in Texas in 1984, in Maryland in 1997, and in the District of Columbia on July 9, 1999. Tr. at 1028. In approximately December 2000, the Director of the D.C. Office of Human Rights, Charles Holman, hired Respondent to head the investigative unit of OHR. Tr. at 48–49, 246.

2. At that time, OHR used a number of outside contractors to assist in the workload of the office, including the preparation of Letters of Determination ("LODs") setting forth the results of OHR's investigation of complaints. Tr. at 50, 67. Respondent, until July 2001, was responsible for ensuring that OHR files were complete before they were sent to contractors to prepare LODs. Tr. at 93–94, 605–06, 704–05.

3. From approximately December 2000 to early May 2001, Respondent also assisted Mr. Holman with the contracting functions of OHR. Tr. at 49, 51, 66; BX 9 at 30.

4. Mr. Holman relieved Respondent of all her supervisory and contracting duties by July 2001 because of her deficient performance and was taking steps at that time to fire her. Mr. Holman's successor fired Respondent in January 2003, for cause. Tr. at 1059–60; BX 33 at 4–7.

5. In early 2001, Curtis Lewis and Associates ("CLA"), a minority-owned law firm in the District, solicited OHR for the opportunity to prepare LODs. In February 2001, Mr. Holman directed Respondent to provide CLA three files for the preparation of LODs, which would allow OHR to evaluate CLA's work product. Tr. at 90–94; BX 16 at 37–60.

6. In March 2001, after CLA had drafted and returned the initial LODs, Mr. Holman discussed with Respondent the contracting needs of OHR and whether they should use CLA to prepare additional LODs. Tr. at 95–97, 170–71, 203–05, 237, 241. Respondent did not raise any concerns or reservations about CLA or their work product, with the possible exception that CLA had not followed the Harvard Bluebook system of citations. Respondent recommended to Mr. Holman that OHR

contract with CLA to prepare LODs. Tr. at 95–99, 101–02, 104–05, 170–71, 205–08, 233, 238–41, 586. While considering whether to contract with CLA, Mr. Holman asked Respondent to identify 50 cases that OHR could send or "outsource" to CLA. BX 9 at 24.

7. On March 26, 2001, Mr. Holman sent Respondent an e-mail requesting her to "prepare a short memo explaining why Curtis Lewis should be given a contract for the LODs in light of the LODs you have received back from them in comparison to those done by the Training Center and others." BX 5; Tr. at 95.

8. By memo dated March 27, 2001, Respondent responded[24] to Mr. Holman as follows:

> In comparison to the other contractors that this office has dealt with, I believe that Curtis Lewis & Associates is deserving of an above average rating. One of their strong points was timeliness since the firm meet [sic] the deadlines on all the cases. Another big plus for this firm is their commitment to make any and all necessary modifications, corrections, etc. I also believe that the firm is well staffed to meet our future needs.

BX 6A; Tr. at 96–97. Mr. Holman included Respondent's memo recommending CLA in the office file maintained for contractors. Tr. at 108, 615–16, 625.

9. Based on Respondent's recommendation, Mr. Holman awarded a sole-source contract to CLA to prepare 32 additional LODs, with instructions that CLA be given no more than five files at a time. Tr. at 98–99, 170–71, 207–08, 233; see also Tr. at 721.

10. After receiving the contract to prepare 32 additional LODs, CLA sought an even larger contract. On May 9, 2001, Mr. Holman sent a memo to Terence Coles, the Assistant to the Mayor's Chief of Staff, describing OHR's dealings with CLA. BX 53. Mr. Holman quoted verbatim the entire text of Respondent's memo of March 27, 2001 (BX 6A), in which she recommended CLA over other contractors. BX 53 at 2; see also RX 12 at 6 n. 13. Mr. Holman stated that while OHR was willing to enter into a larger contract with CLA, it could not do so given the limits on OHR's contracting authority. BX 53 at 3; Tr. at 111–13, 578, 616–17, 624–25.

11. In May 2001, around the time that he wrote to Mr. Coles, Mr. Holman hired Barbara Delaney as his special assistant and assigned her, among other duties, the contracting functions that Respondent had performed. Tr. at 62–63, 66, 595–97, 708–09. In a May 14, 2001 e-mail, Mr. Holman advised Respondent that Ms. Delaney "has been assigned to supervise the office's contracting procedures" and that she would be supervising Respondent with respect to contracting matters. BX 9 at 30.

12. CLA continued to seek an additional contract from OHR after receiving the contract to draft an additional 32 LODs. BX 21 at 8; Tr. at 630–33. In or around June 2001, Joy Arnold, the Mayor's then Chief of Staff, asked Mr. Holman to attend a meeting in the Mayor's Office to discuss the additional contract. Barbara Bullock, the President of the Washington's Teachers Union, Mr. Coles, and Ms. Delaney also attended the meeting. When Mr. Holman explained that OHR had limited contracting authority, Ms. Bullock demanded that CLA be given the contract, and Ms. Arnold assured her that some-

24. Respondent denied she sent this memorandum.

thing would be done. Tr. at 130–31, 631–35, 729–36, 738–39.

13. Neither Mr. Holman nor Ms. Delaney discussed with Respondent this June 2001 meeting at the Mayor's Office concerning CLA. Tr. at 119–20, 635–36. Indeed, Mr. Holman was taking steps to terminate Respondent's employment from OHR no later than June 2001. Tr. at 66, 119.

14. In approximately September or early October 2001, CLA was awarded an additional contract to draft LODs and perform investigations by the Office of Contracting and Procurement on behalf of OHR. Tr. at 113, 120–2, 636–39, 722–23, 736–37, 739; RX 12 at 1.

15. In May 2002, after learning that a former Staff Assistant in the Mayor's Office had been indicted for taking kickbacks from contractors, Mr. Holman advised the Mayor's Office of problems that OHR was having with CLA and noted that the former staffer had been involved in awarding the larger contract to CLA. Mr. Holman had a further meeting with the Mayor's Office to discuss CLA, and shortly thereafter was asked to resign. Tr. at 125–29. Mr. Holman later filed suit, contending he was fired because of his criticism of CLA and raising questions about the former staffer's role in steering the OHR contract to CLA. BX 10 at 2–3.

B. *OHR's Contracts with Vere Plummer*

16. In September 2000, OHR entered into a written contract with attorney Vere Plummer to represent a complainant in an OHR proceeding. Tr. at 52–53. OHR entered into a subsequent contract with Mr. Plummer in November 2000, relating to the same representation. Mr. Plummer represented the complainant from September 2000 through at least the end of March 2001. BX 9 at 11–18.

17. In a memorandum to Mr. Holman dated April 20, 2001, Respondent noted that Mr. Plummer did not have a contract or purchase order covering the period from November 2000 to March 2001. Respondent did not recommend that OHR not pay Mr. Plummer because of the lack of a written contract, but instead recommended that OHR pay him $4,602, less than half of his invoice, because, according to Respondent, his services were "duplicated," "excessive," or unverified. BX 9 at 26.

18. Subsequently, Mr. Holman, in consultation with Ms. Delaney, determined that Mr. Plummer should be paid because, notwithstanding the lack of a written contract, he had done the work at OHR's request. Tr. at 53–54, 72, 597–98, 657–58, 665–68, 715, 718.

C. *Respondent's Performance Issues*

19. Shortly after hiring Respondent, Mr. Holman began to experience problems with her performance, including her unexplained absences from work; her failure to turn in work on a timely basis; the poor quality of her work product; and her contentious nature. Tr. at 76–80, 84, 149, 198–203, 206, 216, 244, 607–09, 709–10.

20. By June 2001, Respondent was aware that Mr. Holman was seeking to fire her and of his stated reasons for doing so. BX 9 at 5–7. After taking the steps he believed necessary to terminate Respondent's employment, Mr. Holman was advised by the Office of Personnel that he could not fire Respondent without first placing her on a performance improvement plan ("PIP"), which he did at the end of July 2001. Tr. at 79–82, 647–48.

21. On July 20, 2001, Mr. Holman permanently transferred Respondent to

 

OHR's Penn Branch office because he believed she had failed to ensure that it was staffed. Tr. at 85–86, 188–89, 217–18; BX 9 at 8. After the expiration of the PIP, Mr. Holman continued to try to terminate Respondent's employment, but was unable to get permission from the Office of Personnel to do so apparently because they believed it would be perceived as retaliation for her complaint about the Plummer contract. Tr. at 83–84, 131, 647–48.

D. *Respondent's July 2001 "Whistleblower Complaint" to the Office of Inspector General*

22. By July 2001, Respondent had been employed at OHR for approximately seven months and therefore was aware of the protections afforded to whistleblowers. *See* BX 7. Further, as stated, Respondent knew that Mr. Holman was seeking to fire her. BX 9 at 5–7.

23. On or about July 20, 2001, Respondent prepared a written complaint entitled "Violation under the Whistleblower's Act," addressed to OIG. In the complaint, Respondent alleged that Mr. Holman had engaged in misconduct because he paid the full amount of Mr. Plummer's invoice even though there was no written contract and Mr. Plummer had overbilled OHR. Respondent further alleged that Mr. Holman had retaliated against her "[a]fter [she] voiced [her] concerns and review of the Plummer oral contract." BX 7. Respondent made no mention of OHR's existing or proposed contracts with CLA in her July 2001 complaint, although CLA had been performing since February 2001.

24. On July 26, 2001, then OIG Special Agent George Scavdis was assigned to investigate Respondent's complaint. BX 8 at 1. Other than the internal routing slip reflecting when and how the complaint was received, the only document in the OIG file was Respondent's three-page complaint, BX 7. Tr. at 343, 401–02, 454–55.

25. Agent Scavdis called Respondent on July 30, 2001, and they spoke the following day to schedule a meeting for August 9, 2001. Tr. at 339, 349; BX 8 at 1. At their meeting on August 9, 2001, Respondent provided Mr. Scavdis a nine-page chronology that she had prepared as well as other documents to support her allegations against Mr. Holman relating to the Plummer contract. Tr. at 347–50, 354–55, 436, 448; BX 9 at 1–46. In the nine-page chronology, Respondent made no mention of CLA or any OHR contractors other than Vere Plummer and Perry Crutchfield, another contractor with whom Respondent was "having conflicts." Tr. at 439–40, 450–52; BX 9. The chronology did, however, recount that Mr. Holman had reassigned Respondent's supervising duties and had been very critical of her performance (BX 9 at 3–9)—allegations that apparently were offered in support of her retaliation claim. *See* BX 7 at 2–3.

26. Most of the other documents that Respondent provided Mr. Scavdis concerned the Plummer contract and invoices. Tr. at 347–49, 355, 450–52; BX 9 at 10–46. However, she did provide documents that purportedly supported her retaliation claim, including copies of three emails that refer to CLA. BX 9 at 24–25.

27. Respondent's only reference to the three e-mails that mention CLA was in connection with her assertion that Mr. Holman was picking on her even though she was allegedly "such a good employee" doing "great work" and had to correct the work of others. Tr. at 356–57, 407, 414–15, 451; *see also* BX 20 at 465–66, 470–73; Tr. at 379–80.

28. Mr. Scavdis investigated the allegations that Respondent had made in her written complaint and at their August 9, 2001 meeting by obtaining documents and

interviewing other witnesses. Tr. at 359–61; BX 8, 344–45; *see also* Tr. at 74–75, 86–87,134, 610–12. If Respondent had complained about OHR's contracts to CLA, Mr. Scavdis would have made a record of the allegations and would have investigated them. Tr. at 353–54, 367–68, 457–58.

29. Mr. Scavdis completed the investigation of Respondent's complaint in late October 2001, and prepared a report setting forth the results of the investigation: that OIG substantiated Respondent's allegation that Mr. Holman had violated D.C. regulations by authorizing payment to Mr. Plummer pursuant to an oral agreement. Tr. at 365–66; BX 8 at 3. However, OIG did not find evidence to support Respondent's allegation that Mr. Plummer had overbilled OHR. Tr. at 360–61, 463–64.

E. *Respondent's Complaints to Others within the D.C. Government*

30. In or about September 2001, Respondent prepared a 36–page memorandum entitled "Grievance Performance Improvement Plan" addressed to Carolyn Graham, the Deputy Mayor, in which Respondent complained about Mr. Holman's placing her on a PIP. BX 34 at 52–87. In the grievance memo, Respondent was highly critical of Mr. Holman, contending that he had not properly managed OHR and that he should be investigated and terminated. BX 34 at 85. Respondent also contended that a number of other OHR employees and contractors were incompetent. BX 34 at 54–86.

31. In the grievance memo, Respondent did not complain that Mr. Holman or OHR had steered contracts to CLA. Respondent did mention CLA in her grievance memo in a paragraph on page 25, where Respondent claims that despite CLA's unacceptable work product and low-er bids from other contractors, Mr. Holman continued to contract with CLA. BX 34 at 76; *see also* BX 16 at 26–27. Respondent never provided a copy of the memo or any version thereof to OIG. Tr. at 343, 373–74, 388, 404–05 (Scavdis); BX 34 at 10, 15–17.

F. *Respondent's Second Whistleblower Complaint to OIG in November 2001*

32. On November 21, 2001, Respondent submitted a second complaint to OIG about Mr. Holman. In this complaint, which Respondent made by telephone to OIG's hotline, Respondent alleged that Mr. Holman had improperly used her travel credit card to purchase office supplies and had forged her signature on an invoice. Tr. at 766–69, 881–82. On the same day she made the complaint, Respondent sent a fax to James Izzard, the Special Agent with whom she had spoken by telephone, attaching documents and regulations relating to the use of the credit card. BX 34 at 127–47; Tr. at 769–70.

33. OIG assigned Respondent's second complaint to OIG Special Agent Denmark Slay on November 21, 2001, and consolidated it with another investigation that Mr. Slay was conducting based on allegations by Laurie Bay, another OHR employee, that Mr. Holman had received gifts from staff members that exceeded the $10 limit, and relating to time and attendance matters. Tr. at 751–54, 881, 884–85. When Mr. Slay met with Ms. Bay to discuss the allegations against Mr. Holman on November 29, 2001, Ms. Bay alerted Mr. Slay that Respondent also had a complaint against Mr. Holman that concerned the alleged improper use of a credit card. Tr. at 752, 760, 810–12.

34. Mr. Slay met with Respondent on December 11, 2001, at her office at OHR. Tr. at 764, 815–16; BX 24 at 3. Mr. Slay

questioned Respondent about her allegation concerning the improper use of her credit card. Tr. at 773–75. Respondent did not say anything to Agent Slay about CLA. Tr. at 773, 780, 804, 815–16, 898, 909.

35. Mr. Slay investigated Respondent's allegations by interviewing witnesses and obtaining documents. Tr. at 775–78. Mr. Slay then submitted a report setting forth the results of the investigation: OIG found that OHR properly used a purchase card, not a travel card, to purchase office supplies. Tr. at 775–76, 780, 863–64, 871–73. OIG issued a final report in December 2002 stating that Respondent's allegations, as well as Ms. Bay's allegations, were unsubstantiated. Tr. at 779.

G. *Respondent's Outside Employment*

36. In July 2001, approximately eight months after she was hired as a full-time employee of OHR, Respondent reported to the D.C. Bar that she was affiliated with the law firm Ramson & Asher. BX 52 at 3. Before that, Respondent had been engaged in the private practice of law, including filing pleadings and appearing in court on behalf of clients. See BX 31; BX 31A; BX 32 and 32A; BX 55.

37. In 2001 and throughout 2002, Respondent also maintained a business address for her law practice—3540 Crain Highway., Bowie, Maryland. It was this address, not Respondent's home address at Arabella Court in Upper Marlboro, that she listed on pleadings that she filed as counsel in 2001 and 2002, while a full-time OHR employee. *See* BX 31; BX 32; BX 32A.

38. As an OHR supervisor, Respondent was required to complete a "Confidential Statement of Employment and Financial Interests" form (Form 35) on an annual basis that Mr. Holman reviewed. Respon-

dent never disclosed on the form or to Mr. Holman that she was engaged in the private practice of law. BX 54; Tr. at 145–47, 226–28.

39. Sometime in 2002, Mr. Holman learned that Respondent was listed by the D.C. Bar as being associated with Ramson & Asher. Tr. at 144–45, 218–21, 228, 245–46. In or around May 2002, Linda Ogeltree, Mr. Holman's assistant, called that law firm; the person answering said that Respondent worked there but was not there presently. Tr. at 144–45, 219. On May 14, 2002, Mr. Holman called OIG's hotline and reported Respondent's affiliation with Ramson & Asher and his concern that Respondent was engaged in the private practice of law while employed at OHR. Tr. at 140, 144–45, 228, 246, 781–83, 789, 845–46; RX 1(a) and RX 1(b).

40. Mr. Holman's OIG complaint against Respondent was assigned to Mr. Slay to investigate. Tr. at 783. When Mr. Slay contacted Ramson & Asher in January 2003, Ms. Ramson advised him that Respondent had not been employed by the firm for a number of years. Tr. at 784–85, 78–90. Shortly thereafter, OIG closed its investigation. Tr. at 785, 843.

H. *Respondent's Termination from OHR and Subsequent Allegations to Vincent Orange*

41. On January 9, 2003, Ms. Wilburn, the then Interim Director of OHR, terminated Respondent's employment. In mid-January 2003, shortly after Respondent's termination from OHR, articles appeared in the press reporting that Ms. Bullock of the Washington Teachers' Union had demanded that OHR give a contract to CLA. BX 13–15. The articles referred to Mr. Holman's lawsuit against the Mayor filed in September 2002, in which Mr. Holman made similar allegations, which also had

been the subject of press reports. BX 10 at 2–3; BX 11–12.

42. Respondent was aware of the news articles in mid-January 2003 linking the Teachers' Union with CLA and OHR. BX 20 at 359 (Respondent testified in response to questions that she was "surprised" by articles in January 2003 to learn of a "real connection" between CLA and D.C. Public Schools). She contacted Vincent Orange, a long-time friend who was then a member of the D.C. Council. Tr. at 1373–75. Prior to the news articles, Respondent had never contacted Mr. Orange about CLA or her complaints to OIG. Tr. at 1392–93.

43. On or about January 28, 2003, Respondent provided Mr. Orange a memo in which she claimed that she had submitted complaints to OIG regarding Mr. Holman's misconduct in awarding contracts to CLA. BX 16 at 2–35. Respondent alleged that she met with Agent Scavdis on July 30, 2001, and gave him "copies of e-mails from Holman requesting me to steer contracts to Curtis Lewis" and "orally told Mr. Scavdis that Holman was steering contracts to Curtis Lewis because Holman stated that he was ordered to give contracts to Curtis Lewis because Curtis Lewis was well connected to the Mayor."

BX 16 at 1. Respondent further alleged that she met with Agent Slay on November 9, 2001, and they discussed several things that were set out in a November 9, 2001 memo purportedly addressed to Agent Slay that Respondent provided to Mr. Orange. BX 16 at 1; BX 16 at 36 (purported memo to Slay dated Nov. 9, 2001).[25]

44. Respondent's memorandum was directly contradicted by the testimony of Agent Scavdis and Slay, who testified that Respondent had not complained to OIG about CLA and had never alleged that Mr. Holman or OHR was steering contracts to CLA. Tr. at 361–62, 367, 375–78, 773, 780, 794–95, 802, 804, 815–16, 898. Further, with one exception—the March 12, 2001 email from Mr. Holman to Respondent—Respondent had not provided OIG with any of the documents attached to her January 28, 2003 memorandum to Mr. Orange. Tr. at 376, 404–06, 797–98.

45. One of the documents that Respondent provided to Mr. Orange was a 34–page memorandum entitled "Grievance Performance Improvement Plan." BX 16 (Exhibit a) at 2–35. This document was an altered version of the grievance memorandum that Respondent had e-mailed to Ms.

**25.** BX 16 is a document entitled "Fax Memorandum" dated January 28, 2003 sent from Respondent to Mr. Orange. BX 16 includes Exhibits A through C used at the 2003 D.C. Council hearings. Exhibit A is the 34–page memorandum allegedly sent to Deputy Mayor Carolyn Graham entitled Grievance Performance Improvement Plan. Exhibit B is the November 9, 2001 memo addressed to OIG agent Denmark Slay entitled Incidents verifying Charles Holman (OHR director) Mismanagement and Waste of Funds Violations. Exhibit C contains the following: a memo dated February 1, 2000 from Charles Holman to the Equal opportunity Specialist Supervisor entitled Sophia Garland Case (99–239) and Other Cases for Contractor Curtis Lewis & Associates ("CLA"); a letter dated February 21,

2001 to Charles Holman from CLA regarding several LODs; a second letter dated February 26, 2001 to Charles Holman from CLA mentioning a telephone conversation with Respondent; an e-mail dated March 12, 2001 from Charles Holman to Respondent requesting her to provide a list of 50 cases that could be outsourced; two handwritten notes purportedly written by Charles Holman; a contract for personal services; the altered March 15, 2001 memo to Charles Holman from Respondent entitled Contracts for Preparation of Letters of Determination; and a letter dated March 22, 2001 from CLA to Charles Holman thanking Mr. Holman for the opportunity to allow CLA to demonstrate its ability to prepare LODs.

 

Graham and others on October 4, 2001. BX 34 at 15–18; Tr. at 498–500.

46. Respondent also provided Mr. Orange a one-page document which purported to be a memo that Respondent provided to Mr. Slay on November 9, 2001, listing numerous acts of alleged misconduct by Mr. Holman. BX 16 at 36. The date of the purported memorandum, November 9, 2001, predated Respondent's complaint to OIG (that was eventually assigned to Mr. Slay) by more than 10 days and their actual meeting by more than a month.

47. Respondent also provided Mr. Orange a collection of correspondence, memos, and e-mails that she marked as Exhibit C. BX 16 at 37–50. One of the documents Respondent included in the collection of documents marked as Exhibit C was a three-page memorandum to Mr. Holman dated March 15, 2001, in which Respondent was critical of CLA and contended that Mr. Holman's "motive for proposing to provide a contract to Curtis Lewis that exceeds the Office's contracting authority [was] because Curtis Lewis is well connected to the Mayor." BX 16 at 45–47 (quoted language on last page) (emphasis in original). As stated above, OIG investigators testified that Respondent never provided this document to OIG in 2001, nor did she complain to OIG about CLA. The content of the March 15, 2001 memo contradicts the advice that Respondent gave to Mr. Holman in a memo of March 27, 2001, where she recommended that OHR enter into a contract with CLA to prepare additional LODs. BX 6A; Tr. at 109–10, 586–87, 624, 626–28, 653. Notably, the date of Respondent's purported March 15, 2001 memo to Mr. Holman predates the June 2001 meeting that Mr. Holman and Ms. Delaney had in the Mayor's Office, at which they first became aware of CLA's political "connection" and were directed to provide CLA an additional contract. Tr. at 110–13, 130–31, 153–54, 651, 728–30.

48. In a March 5, 2003 letter to the Mayor (BX 17), Mr. Orange quoted extensively from Respondent's purported memo to Agent Slay dated November 9, 2001 (BX 16 at 36) and her purported memo to Mr. Holman dated March 15, 2001 (BX 16 at 45–47). Mr. Orange urged the Mayor, as well as Congressman Davis and Delegate Norton, to remove Charles C. Maddox, the incumbent Inspector General, based in part on his alleged failure to investigate Respondent's complaint that contracts were being steered to CLA because CLA was well connected to the Mayor.[26] BX 19 at 10–15. Mr. Maddox was already the target of criticism from various City Council members who felt that the IG was not diligent enough in policing what they viewed as abuses of the Office of the Mayor and his administration. See Tr. 1379–80; BX 17 at 5.

I. *Respondent's Testimony at the March 7 and 27, 2003 D.C. Council Hearings*

49. On March 7, 2003, Respondent appeared at an oversight hearing of the D.C. Council's Committee on Government Operations, chaired by Mr. Orange. Although Respondent had used the surname "White" during her entire employment at OHR (and did so at the hearing herein),

---

**26.** Mr. Maddox, the then head of OIG, and OIG first learned of Respondent's allegations about OIG's alleged failure to investigate Respondent's allegations after receiving copies of Mr. Orange's March 5, 2003 letters to the Mayor, Congressman Davis and Delegate Norton in support of the bill that would change the qualifications of the IG and render Mr. Maddox ineligible to hold the position. BX 19 at 10–15; Tr. at 480–85.

she used the surname "Parrish" in her communications with Mr. Orange and before the D.C. Council. Tr. at 804; BX 16; BX 18; BX 20; BX 21; BX 28; BX 30; see also BX 33.

50. In her prepared testimony, Respondent stated that she had submitted an e-mail to OIG on July 20, 2001, informing OIG of "contracting and personnel irregularities within [OHR]" and that she "orally told Mr. Scavdis that Holman was steering contracts to Curtis Lewis because Holman stated that he was ordered to give contracts to Curtis Lewis because Curtis Lewis was well connected to the Mayor." RX 4; BX 18; BX 20 at 339–40. Respondent also testified that she had e-mailed Mr. Scavdis a 34–page memo which addressed, among other things, the "awarding of the contract to [CLA]." BX 20 at 340–41. OIG investigators testified that Respondent never provided the grievance memo to them and she had never complained about CLA. Rather, they said, she complained only about the Plummer contract and her alleged mistreatment by Mr. Holman. BX 20 at 419–21, 428–34, 448–73; Tr. at 375–78. The Committee credits the testimony of the Agents in this regard.

51. OIG testimony also directly contradicted Respondent's testimony that she had met with Mr. Slay on November 9, 2001 and, during this meeting, had advised him of "several violations of [OHR]" including "the issuance of the preferential contract to [CLA]" and "provided him with documents and e-mails relating to these violations." BX 18 at 1–2; BX 20 at 341. OIG's records date the first November contact as November 21, 2001.

52. In response to questions at the Council hearing, Respondent expanded her testimony concerning the complaints she claimed to have filed with OIG stating, among other things: (1) that she contacted Mr. Scavdis when she learned that CLA was to receive an additional contract from OHR (BX 20 at 345); (2) that she told Mr. Scavdis about other bidders who she claimed were more qualified than CLA (BX 20 at 347); (3) that she reported to Mr. Scavdis that she had discussed her concerns about the quality and cost of CLA work with Mr. Holman and that Mr. Holman "told me that he was ordered to do this because Curtis Lewis was well connected to the Mayor" (BX 20 at 349–50, 355); (4) that the "greatest topic" that she discussed with Mr. Slay on November 9, 2001, was "the contract of Curtis Lewis & Associates and the contracting" (BX 20 at 351); (5) that she discussed the purported memorandum of November 9, 2001 (BX 16 at 45–47) with Mr. Slay at the meeting on November 9, 2001 (BX 20 at 351–52); and (6) that she had provided the March 15, 2001 memo concerning CLA to Mr. Holman (BX 20 at 355).

53. After Respondent's testimony at the Council hearing, Mr. Maddox as well as Agent Scavdis, Agent Slay, and the IG's General Counsel testified under oath concerning the complaints that Respondent actually filed or made to OIG, and OIG's investigation of those complaints. BX 20 at 373–79, 414–97.

54. Mr. Scavdis testified that Respondent's complaint submitted in July 2001 concerned Mr. Plummer, not CLA. Mr. Scavdis testified that when he met with Respondent on August 9, 2001 (not July 30, 2001), they discussed the Plummer contract, but she did not say anything about OHR's steering contracts to Curtis Lewis. Mr. Scavdis admitted that Respondent had provided him some e-mails referring to CLA, but reiterated that Respondent never complained about or discussed CLA with him, and that he understood that the e-mails were somehow related to her claim that Mr. Holman had retaliated against

her. BX 20 at 419–21, 428–34, 448–73; Tr. at 379–80.

55. Mr. Shay testified that, contrary to Respondent's statements, she had never provided him the November 9, 2001 memorandum. He further testified that during their meeting, which occurred on December 11, 2001 (not November 9, 2001), she advised him of her prior complaint concerning Mr. Plummer and they then discussed Mr. Holman's alleged improper use of her credit card. Respondent did not complain about or discuss CLA with Mr. Slay. BX 20 at 422–29, 445, 453, 473–74, 488–90; Tr. At 805–07; *see also* Tr. At 773, 780, 804, 815–16, 898, 909.

56. On March 10, 2003, Respondent faxed Mr. Orange another memo attaching additional documents, including five e-mails, one of which had been significantly altered (BX 21 at 5), and a report and memo that she claimed Ms. Delaney had prepared. BX 21 at 1, 7–10. Contrary to her representations to Mr. Orange, Respondent had provided OIG only one of the documents—the same March 12, 2001 e-mail that she attached to her January 28, 2003 memo to Mr. Orange. BX 21 at 2; BX 16 at 41; BX 9 at 24; Tr. at 381–82.

57. On March 27, 2003, Respondent testified again before the D.C. Council. After being sworn, Respondent read the written statement that she had prepared (BX 28) and then responded to questions from Mr. Orange. BX 30 at 38–77.

58. In her sworn testimony, Respondent contended that Agents Scavdis and Slay testified falsely about their interaction with her. BX 30 at 40–41. Respondent testified that she had discussed CLA with both Agents Scavdis and Slay, and stated among other things: (1) that Agent Scavdis assured Respondent he would investigate OHR's contracting procurement procedure and review all contracts ratified by OHR (BX 30 at 40); (2) that she provided Agent Scavdis contract and procurement regulations and the Whistleblower's Act, with which he was allegedly not familiar (BX 30 at 41); (3) that she submitted a November 9, 2001 memo to Agent Slay listing eight personnel and contracting violations, which she discussed with him at their meeting on that date (BX 30 at 41, 67–68, 76); (4) that she told Agent Slay about the disparity between contracts on November 9, 2001 (BX 30 at 66); (5) that she provided Agent Scavdis with "everything," including her March 12th memo (March 15th) to Mr. Holman concerning CLA's contracts, as well as e-mails about meetings with two CLA associates (BX 30 at 71); and (6) that she told Agent Scavdis that, over Respondent's objection, Mr. Holman had given CLA work (BX 30 at 72).

59. During the March 27, 2003 hearing, Respondent also repeated under oath her statements concerning the dates on which she met with Agents Scavdis and Slay. Respondent testified that she met with Mr. Scavdis on July 30, 2001, and with Mr. Slay on November 9, 2001 (BX 30 at 74–76)—the latter date being the date of a memo (BX 16 at 36) that Respondent testified she gave to Mr. Slay. She also testified about her knowledge of the OIG investigation, requested by Charles Holman, regarding whether she was simultaneously employed by an outside law firm while at OHR (BX 30 at 14–15).

### J. *OIG's Internal Inquiry*

60. After Respondent's Council testimony on March 7, 2003, OIG conducted an internal inquiry into Respondent's allegations. Jason Grimes, the then Director of Investigations at OIG, conducted the inquiry.

61. In connection with OIG's internal inquiry, Mr. Grimes requested and obtained the assistance of OCTO and the Secret Service to conduct searches on the computers used by Respondent at OHR and by Mr. Scavdis at OIG to determine the validity of Respondent's assertions concerning e-mails she claimed to have sent Mr. Scavdis and/or OIG. BX 26; Tr. at 489–90, 494–95, 502–04, 510, 527, 534–37. The computer searches revealed no evidence to support Respondent's contentions. BX 34 at 14; Tr. at 500, 502; 387–88, 446–47.

62. Based on the computer searches, OIG was able to determine that the 34–BX 16 at 2–35; BX 34 at 17; Tr. at 501–02, 527–30, 539–41; *see* BX 20 at 460. Among other alterations that OIG found that Respondent made to the memorandum she sent to Ms. Graham was the deletion of the bolded phrase in her opening paragraph:

> I believe that Mr. Holman initiated the Performance Improvement Plan in order to eventually terminate my employment with the Office of Human Rights because I first refused to approve an invoice from a contractor who's contract had expired and because I reported this [changed to "a"] contract violation with the D.C. Inspector General's Office.

*Compare* BX 34 at 52 (first page of actual memo e-mailed to Graham) *with* BX 16 at 2 (first page of memo provided to Orange). Respondent also deleted references to Mr. Holman's alleged improper use of her travel credit card. Tr. at 502–03, 528–29, 540–41; *see* BX 34 at 122–26.

63. On March 25, 2003, OIG presented Mr. Orange and other members of the D.C. Council a written report of the results of OIG's internal inquiry demonstrating the falsity of Respondent's testimony, and provided supporting documentation. BX 25 at 2–4; Tr. at 492–93. Nevertheless, Mr. Orange and the Council proceeded to push legislation and take other actions to remove Mr. Maddox as IG based, in part, on Respondent's false statements and documentation that OIG had failed to investigate her complaints about OHR contracts to CLA. Tr. at 1408–11, 1437–38, 1448–50.

K. *Bar Counsel's Investigation of Respondent's Actions*

64. In May 2006, Bar Counsel opened an investigation of Respondent based upon OIG's earlier referral: that Respondent had presented false testimony and documents to the D.C. Council and that she had concealed her outside employment while a full-time OHR employee. BX 35.

65. On June 6, 2006, Bar Counsel served Respondent with a subpoena *duces tecum* directing her to produce, among other things, copies of all documents, including e-mails, that Respondent provided to OIG, the D.C. Council, and/or any members or staff thereof relating to her allegations of contract steering and/or to CLA. BX 37, BX 39.

66. Respondent received the subpoena and requested additional time to respond, but then failed to produce any documents responsive to the subpoena. BX 39–BX 42. Instead, Respondent filed a motion to quash arguing that, for numerous reasons, Bar Counsel lacked a basis for issuing a subpoena for certain of the documents. BX 43.

67. In an order issued on March 1, 2007, Hearing Committee Number Eleven denied Respondent's motion to quash and directed Respondent to produce documents responsive to Bar Counsel's subpoena *duces tecum* within 15 days of the order. BX 49. The Board Office sent Respondent a copy of the Hearing Committee's order on March 1, 2007. *Id.*

68. By March 28, 2007, Respondent had not produced any documents or otherwise responded to Bar Counsel's subpoena *duces tecum*. By letter dated March 28, 2007, Bar Counsel advised Respondent of her failure to comply with the Hearing Committee's order of March 1, 2007. BX 50. In a submission dated March 31, 2007, Respondent contended that she either did not possess responsive documents or could not locate such documents. BX 51. Respondent never provided any documents responsive to the subpoena.

69. On August 29, 2008, four days after she was served with Bar Counsel's hearing exhibits, Respondent filed a Motion to Strike Bar Counsel Exhibits. Respondent attached to her Motion five exhibits that she later filed with other documents as her proposed hearing exhibits, including: (1) an 8–page document entitled "LIST OF CHRONOLOGICAL EVENTS" (RX 2); (2) a one-page document captioned "TRANSMISSION VERIFICATION REPORT" (RX 3); and (3) a one-page document that purports to be an e-mail from Respondent to hotmail@dcig.org sent on July 20, 2001, at 12:43 AM. RX 4.

70. Prior to August 29, 2008, Respondent had not provided Bar Counsel any of the three documents, even though they were responsive to Bar Counsel's subpoena. Respondent claimed that she had "located her exhibits on Friday, August 29, 2008." Respondent's Motion for Leave to File List of Exhibits, at 1. In her Motion to Strike faxed on August 29, 2008, Respondent contended that RX 2, RX 3 and RX 4 would contradict the statements of Mr. Scavdis. BX 59 at 3. However, because Respondent did not testify, there was no evidence that she ever provided RX 2, RX 3 or RX 4 to Mr. Scavdis or OIG. Mr. Scavdis testified that he first saw the documents a few days before he testified on September 5, 2008. Tr. at 437, 440.

71. RX 2, an 8–page chronology, is an altered version of the nine-page document that Respondent provided Mr. Scavdis at their meeting on August 9, 2001. BX 9 at 1–9 (also HCX 1). Contrary to Respondent's statement in her pre-hearing pleadings (BX 59; List of Exhibits), the evidence of record showed that she never provided Mr. Scavdis with RX 2. Rather, she gave him the chronology that is marked as BX 9 at 1–9. Tr. at 425–26, 438–40, 459–60, 465–67. Respondent has altered the documents to include numerous entries in RX 2 concerning CLA that were not included in the actual chronology that she provided to Mr. Scavdis. The Committee concludes that Respondent created a false document (RX 2) that she provided to the Committee.

72. The content and formatting of RX 3—"FAX COVER SHEET"—raises serious issues about its authenticity. The fax cover sheet, purportedly dated September 21, 2001, is different from the fax cover sheet that Respondent actually sent to Agent Izzard on November 21, 2001. *Compare* RX 3 *with* BX 34 at 127. Further, after "COMMENT" on RX 3, Respondent states she had filed the grievance with Deputy Mayor Carolyn Graham's office, but she did not actually e-mail the grievance to Ms. Graham until three weeks after the date of RX 3, October 4, 2001. BX 34 at 49–51. Finally, RX 3 purports to attach a page from the "Broiler Plate Report"—a non-existent document but an apparent reference to the "Front Burner Report," an internal management report that was used by the Mayor's Chief of Staff to gather information and prioritize issues among the agencies. *See* BX 21 at 7–9. This mis-reference carries a strong implication that the actual document was not in Respondent's possession when the fax cov-

er sheet was supposedly transmitted. The Committee concludes that RX 3 that Respondent presented to the Committee was an altered document.

73. RX 4, a purported e-mail to OIG sent on July 20, 2001 at 12:43 AM, was also a falsely made or altered document. Contrary to her statement that she sent this e-mail to OIG on July 20, 2001 (BX 59 at 3; Respondent's List of Exhibits (description for RX 4)), OIG never received this or any other e-mail from Respondent on July 20, 2001. Tr. at 419, 442–43, 445, 530. Further, RX 4 does not contain a valid e-mail address for OIG, but rather has two incorrect e-mail addresses—which if sent would have generated return notices within a matter of milliseconds, *i.e.*, July 20, 2001, at 12:43 AM. Tr. at 1487–89, 1511–12, 775, 821, 443–44, 501, 519–20.

74. The content and formatting of the e-mail (RX 4) raise further issues concerning its authenticity. The transmittal time reflected on RX 4 is more than 12 hours earlier than that of the notice of returned e-mail that Respondent provided to the D.C. Council in 2003. As stated, the notice of returned e-mail would have been generated within milliseconds of the transmission of an authentic message containing an invalid e-mail address. Tr. at 1487–89. Further, RX 4 contains a different attachment ("Whistleblowers Act Violation.doc") than that reflected on the return notice. Compare RX 4 to BX 21 at 6 (attachment is "Whistleblower's Act Violation"). Also, RX 4 is not on computer stationary nor does it include a computer-generated signature line. According to the return e-mail notice, both should have been present on the original e-mail. Tr. at 1515–16. There are other questionable aspects of the formatting: the headings are off to the left, the layout of the lines and planes are not parallel, and there are commas rather than semicolons between addresses on the "cc" line. Tr. at 1506–11. Finally, RX 4 contains Respondent's home telephone number and other edits that purportedly were not suggested by Ms. Bay until 11 hours *after* RX 4 was purportedly sent to OIG. *Compare* RX 4 (e-mail with time of 12:43 AM) *with* RX 16 (purported e-mail exchange between Respondent and Bay on July 20, 2001, at 11:30 AM). The Committee concludes that RX 4, which Respondent presented to the Committee, was a falsified document.

75. In addition to stating that she had provided OIG RX 2–RX 4 (the questionable documents), Respondent also stated to the Hearing Committee that she did not receive or prepare certain documents included in Bar Counsel's exhibits. Specifically, Respondent stated, and argued in her Opposition to Bar Counsel's Motion to Amend Petition, that she had never received Mr. Holman's March 26, 2001 e-mail (BX 5) and that she did not write Mr. Holman the memo responding to his e-mail dated March 27, 2001 (BX 6). BX 59 at 3; Tr. at 28–29, 1659, 1661–62. The fact that Respondent received Mr. Holman's e-mail is evidenced not only by her memo in response, but also by the testimony of Mr. Holman (and his verbatim recitation of the March 27 email in his memo of May 9) (*see* ¶ 10); the testimony of Ms. Bay (Tr. at 990–91, 1061–62 (Respondent showed Bay the e-mail (BX 5) when they were both employed at OHR)); and the fact that Respondent provided a copy of it to Mr. Scavdis on August 9, 2001. BX 9 at 25; Tr. at 355–56. Respondent's statement in her pleading (BX 59) that she did not receive BX 5 and did not write BX 6 was false.

76. Further, the evidence showed that Respondent wrote, initialed, and provided Mr. Holman the March 27, 2001, memo. BX 6A. The memo is responsive in sub-

stance and timing to Mr. Holman's e-mail of March 26, 2001, which requested a memo in response the next day. BX 5. The memo is in the same format and includes the same initials that Respondent used in other memos during the same time period. *Compare* BX 6A *with* BX 9 at 26; *see* Tr. at 1260–61. Finally, the memo, which was included in OHR business records, was reviewed by Ms. Delaney when she assumed responsibility for the contracting functions, and quoted verbatim in a May 9, 2001 memo by Mr. Holman (BX 53). Respondent's statement in her pleading (BX 59) that she did not write the March 27, 2001 memo was false.

### L. *Credibility*

77. Respondent's version of events is inconsistent with the testimony of many witnesses and attributes to them both motive and foresight that seems highly improbable. While Mr. Holman demonstrated an antipathy toward the Respondent that could bring his objectivity into question, Ms. Delaney had no similar relationship with the Respondent, and the Hearing Committee has no reason to disbelieve her testimony about her interactions with Respondent or her observation of Mr. Holman's interactions. Further, there is no basis on which the Committee can find that Mr. Holman not only created false and forged e-mails and documents but had the foresight by May 2001 to include them in OHR's business records and quote from them in his May 9, 2001 memo, and then somehow conspire with Mr. Scavdis to include his March 26, 2001 e-mail in OIG's investigative file.

78. Similarly, to credit Respondent's testimony before the D.C. Council concerning her dealings with OIG, the Committee would also have to find that Agents Scavdis and Slay gave perjured testimony at the Council hearing and the disciplinary hearing; destroyed or concealed documents in OIG's investigative files; falsely altered the chronology and other documents that Respondent claims she provided OIG, and then placed the altered documents back in the official OIG files; and created other false documents including interview notes, memoranda of interview, and reports of OIG's investigation that misrepresented their discussions with Respondent by omitting any reference to CLA. Moreover, the creation of false documents as well as the destruction and concealment of other documents in OIG's official files would have to have been done sometime between March 5, 2003 (when OIG was first put on notice of Respondent's allegations) and March 7, 2003 (the day Respondent testified and OIG actions came under scrutiny).

79. The Committee cannot make such findings and concludes, instead, that the Respondent's version of the events is not credible and that, as noted above, she made false statements and presented false documents to the City Counsel and presented false documents to the Committee and made misrepresentations in her pleadings to the Committee.

### III. CONCLUSIONS OF LAW

A. *Rule 8.4(b) (engaging in criminal conduct (perjury) reflecting adversely on honesty, trustworthiness, or fitness)*

Bar Counsel has charged the Respondent with a violation of Rule 8.4(b) in relation to a number of actions. Rule 8.4(b) states that "[i]t is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's, honesty, trustworthiness, or fitness as a lawyer in other respects." In addition, there need not be an actual charge or conviction in order for the rule to apply.

*In re Slattery*, 767 A.2d 203, 207 (D.C. 2001). As Bar Counsel has correctly stated,

> In the District of Columbia, a person commits the crime of perjury if, having taken an oath or affirmation that she will testify truly, "willfully and contrary to an oath or affirmation states or subscribes any material matter which he or she does not believe to be true and which in fact is not true." D.C.Code § 22–2402(a)(1). Perjury is proven if the evidence shows that "the accused testified falsely and that [s]he did not, at the time, believe h[er] testimony to be true." *Boney v. United States*, 396 A.2d 984, 986 (D.C.1979). "A belief as to the falsity of the testimony is generally inferred from proof of the falsity itself." *Id.* at 986 n. 1; *see also Hsu v. United States*, 392 A.2d 972, 978 (D.C.1978) (elements of perjury are: (1) an oath, (2) before a competent person or tribunal; (3) a statement of false, (4) material fact; and (5) knowledge of the falsity).

Bar Counsel Proposed Findings of Fact at 51.

### Respondent's Employment

On March 27, 2003, Respondent appeared under oath before a duly convened subcommittee hearing of the District of Columbia City Council. During that hearing, she engaged in a colloquy with then-chairman, Councilman Vincent Orange, part of which concerned whether she had outside employment in violation of her terms of employment with OHR.

That colloquy is one basis of the Rule 8.4(b) violation charged by Bar Counsel. After reviewing both the video of the hearing and the actual transcript, the Committee notes that the dialogue between Respondent and the Councilman was remarkable for its brevity and its vagueness.

Chairman Orange asked in a conclusory manner, after discussing the OIG's conduct in questioning the managing partner of the alleged outside employer: "[h]owever, you only worked for the D.C. Government during that time?" In response, she replied "[t]hat was it." *See* BX 30 at 14–15. This question was reasonably understood as asking whether Respondent had been concurrently employed anywhere else while working for the D.C. Government. Moreover, in his testimony before the Committee, Chairman Orange stated that he knew the Respondent personally, but "I am not aware of her working for the D.C. Government and at the same time having full-time employment as an attorney with someone else." Tr. at 1445–46. The OIG closed its investigation after being advised by a partner at the firm at which Respondent was accused of working that Respondent had not been employed there for a number of years. Tr. at 784–85, 789–90, 843.

While the evidence shows that Respondent made several court appearances on behalf of third parties, *see* BX 31 and 32, and may also have received some compensation for one or more of those appearances, the Committee does not find that this activity necessarily rises to the level of "employment" that was referenced at the Counsel hearing. Thus, Bar Counsel has not shown by clear and convincing evidence that Respondent would have known that her answer to Chairman Orange's question was false and therefore has not established a violation of Rule 8.4(b) for her testimony regarding outside employment.

### Respondent's Knowledge of Contract Steering

The primary subject of Respondent's testimony before the City Council (and the primary basis of Bar Counsel's charge of perjury) concerned her alleged knowledge of politically motivated contracting prac-

tices at OHR and OIG's alleged failure to discover such irregularities after being informed of them by Respondent on more than one occasion. Thus, the question is whether Respondent made knowingly false statements to the City Council regarding her statements to OIG regarding CLA's contracts.

There is some evidence that Respondent did know of contract irregularities and brought them to the attention of OIG, albeit in a very muted way. In her submission to the OIG, Respondent did include the two emails regarding the assignment of contracts to CLA (see BX 9 at 24–25) and did refer to conflicting opinions with Mr. Holman regarding the awarding of contracts (BX 9 at 44) albeit without a reference to any particular contractor.

Ms. Stewart testified that it was common knowledge around the office that CLA was politically well connected. See Tr. 1269–1270. Also, for unexplained reasons, Mr. Holman was reporting directly to the Mayor's office about the hiring of CLA and included in his May 9, 2001 memo a specific reference to contractual limitations regarding the number of cases the CLA was seeking. Respondent did state in her September 2001 email to Ms. Graham that Mr. Holman continued to contract with CLA despite unacceptable work product and lower bids from others. BX 34 at 76.

In view of these facts and circumstances, the Committee believes Respondent had some knowledge of irregularities with the CLA contracts and made some effort to get OIG to look into the overall contract process, along with her real complaints about the Plummer contract and payments. However, the Committee does not believe that Respondent ever referred to these irregularities as "contract steering" or politically motivated corruption.

Furthermore, the Committee has concluded that at this late date, no one can reasonably be certain about what was orally discussed in various interviews between OIG and Respondent and certainly no reliable conclusions can be made regarding what was emphasized versus what was not emphasized. This conclusion is supported by the fact that the Committee was not persuaded that the notes and files of the OIG are necessarily a full record of what was said during an interview. For example, the testimony of Laurie Bay regarding her interview by Agent Slay differed widely from Slay's notes of that interview.

Accordingly, the Committee concludes that Bar Counsel has not presented clear and convincing evidence that Respondent was unaware of CLA contract irregularities and did not orally bring any such irregularities to the attention of the OIG during the course of her interviews. As a result, the Committee finds that to the extent the Respondent was asked whether, or stated affirmatively under oath that, she was aware of contract irregularities in regards to the CLA contract(s) or that she told OIG about them, her statements are not a basis for a violation of Rule 8.4(b).

Respondent's Embellishment

However, the foregoing is in no way dispositive of the Rule 8.4(b) issue arising from the documents that Respondent submitted to the City Council in support of other, more explicit statements about her knowledge of specific political motivations, or her related testimony, all submitted in an apparent effort to make her a central character in exposing OIG incompetence and uncovering what turned out to be a multi-layered political scandal.

In this instance, the evidence of knowing falsity is overwhelming. For whatever reason, which only Respondent knows, the evidence shows that Respondent chose to embellish her prior actions to the point of

making perjurious statements and submitting false evidence to the Council in support of such statements. At principal issue are (1) the original memo sent to Deputy Mayor Graham versus the version shared with the Council [BX 34 at 52–87; BX 16 at 2–35]; (2) the November 9, 2001 memo that Respondent allegedly shared with Agent Slay [BX 16 at 36]; (3) the e-mails to OIG that were allegedly sent but never delivered due to fatal address errors [BX 21 at 6]; and (4) the alleged March 15, 2001 memo detailing Respondent's objections and criticisms of CLA [BX 16 at 45]. All of Respondent's testimony regarding these documents at the March 27, 2003 D.C. Council hearing is also of great concern because it is false.

 a. The Graham memo submitted to the Council: The Committee fully credited the testimony by Agent Grimes[27] related to the OIG's investigation (with the assistance of OCTO and the U.S. Secret Service) of the Graham memo. In great detail, the OIG analysis demonstrated numerous differences between the original 36–page memo created in 2001 and emailed to Ms. Graham [BX 34 at 52–87] and the 34–page version provided to Mr. Orange and the D.C. Council in 2003. BX 16 at 2–35; Tr. at 492–93, 498–505, 527–30, 539–41.

 b. The November 9, 2001 memo: During the March 7, 2003 D.C. Council hearing, Respondent discussed in great detail the memo that she allegedly gave to Agent Slay on November 9, 2001. BX 20 at 89. The Committee, however, has concluded that there is clear and convincing evidence that no such meeting took place on that date between Agent Slay and Respondent. Moreover, the evidence showed that respondent never transmitted the November 9 memo to OIG, but that she in fact created the memo solely for the purpose of embellishing her testimony at the hearing.

 c. The emails to OIG: The OCTO analysis of Respondent's hard drives along with the corroborating testimony from Mr. Mancini, the current OCTO program manager in charge of all emails for the D.C. Government (whose professional expertise and knowledge were un-assailed during the proceedings), leave no doubt in the Committee's view that, with the exception of the March 12, 2001 email from Mr. Holman to Respondent (BX 21 at 2), the e-mails Respondent submitted to Bar Counsel were never attempted to be sent to the OIG on the dates that Respondent alleges/presents in her exhibits. Tr. 1528–39; RX 4, RX 16, RX 18, RX 21 at 4. Had Respondent sent them to the wrong email addresses, as reflected in the exhibit documents themselves, they would have been returned as undeliverable almost immediately. As Mr. Mancini testified, a non-delivery error would have generated a response to the Respondent within seconds, informing her almost instantly that her transmission was not received. *See* Tr. at 1489. Without any evidence to show that

---

**27.** Agent Grimes never had any direct contact with Respondent during the periods in question; nor was his reputation at stake in conducting the internal audit. Accordingly, even if there were some conspiracy by Agents Slay and Scavdis to omit or overlook things related to how they interacted with Respondent in order to protect their careers and reputations, Agent Grimes had no such motive, nor was there any evidence presented that would suggest that the internal investigation was anything other than fair.

 

the error message function of her email system was not operational when she purportedly sent the emails, the Committee concludes that she fabricated evidence and perjured herself in relation to it.

d. The alleged March 15, 2001 memo: Nothing about the March 15, 2001 memo in which Respondent allegedly submitted detailed criticisms of CLA in order to oppose the initial contract grant to CLA was credible. The Committee first observed the memorandum's header, which inexplicably indicates that the document should not be "placed in any Personnel folder or among any D.C. Government files." BX 16 at 45. There is no logic or reason why this is the only document in the entire record that bears this type of disclaimer, except that Respondent outwitted herself in trying to create a preemptive explanation of why it was neither contained in nor referenced in any of the contemporaneous files, except hers. From this suspicious starting point, the Committee's review ended with the fact that the memo contradicted the more succinct, signed (initialed) and contemporaneous/sequentially dated memo of recommendation that Respondent provided to Mr. Holman on March 27, 2001, which he quoted in his contemporaneous report to the Mayor's office. In sum, the Committee believes that the March 15, 2001 memo (RX 24) is a complete "fiction." Tr. at 113 (quoting Holman).

B. *Rule 8.4(d) (engaging in conduct that seriously interferes with administration of justice)*

The Committee's findings with respect to Rule 8.4(b) are sufficient grounds also to find that Respondent violated Rule 8.4(d). Although Bar Counsel has correctly interpreted the precedents relating to Rule 8.4(d) violations, insofar as actual prejudice is not a necessary element, the record here contains clear and convincing evidence that actual prejudice did occur as a result of Respondent's perjurious conduct in the Council hearings.

While Councilman Orange testified that he and his fellow Council members were pursuing the resignation of the Inspector General before Respondent's "revelations" and would have continued to do so without them (Tr. At 1379–80), the record shows several qualifications to his statements.

The efforts to oust Mr. Maddox and enact special legislation gained a material sense of urgency and strength based on Respondent's falsehoods. These falsehoods provided a major basis for the substantive criticism of incompetence at the OIG. Councilman Orange was so convinced of the veracity of Respondent's statements that he made them a material part of his appeal to Congress (and notice to the Mayor) to rectify what he viewed as the underlying statutory problem with the OIG office. *See* BX 19 at 10–15 (Councilman Orange letters to Congress and Office of the Mayor). Had Respondent's allegations been true, particularly the documents in which she references political motivations for illegal contract practices, then the OIG could well have been reasonably blamed for not preventing or at least uncovering a larger fraud. *See* BX 11–15 (various media articles detailing the influence peddling scandal that resulted in Holman's dismissal and criminal charges being filed against certain city and union officials).

Also, the Committee believes that the reputations of Mr. Maddox and his agents were unnecessarily and unfairly damaged by these proceedings. These agents were basically called liars and incompetents in

more than one public forum, with obvious ramifications on their lives and reputations. These attacks were premised, in substantial part, on their failure to follow up on allegations of corruption that were founded in false documents and falsely embellished testimony by Respondent.

C. *Rule 3.4(a) (altering evidence that lawyer reasonably knew or should have known was or might be the subject of a subpoena); Rule 3.4(b) (falsifying evidence); and Rule 8.1(a) (false representations in connection with a disciplinary matter)*

As Bar Counsel has described them, the relevant sections of the Rules state:

Rule 3.4(a) provides that "[a] lawyer shall not obstruct another party's access to evidence or alter, destroy or conceal evidence ... if the lawyer reasonably should know that the evidence is or may be the subject of discovery or subpoena in any pending or imminent proceeding." Rule 3.4(b) prohibits a lawyer from falsifying evidence. Furthermore, Rule 8.1(a) states that "a lawyer ... in connection with a disciplinary matter shall not knowingly make a false statement of fact."

PFF at 54 and 56.

The evidence in support of Respondent's violations of these charges was so overwhelming that the Committee cannot understand why a lawyer would go to such great lengths to conceal her prior misdeeds. The issues relating to falsification were so significant during the hearing that the Committee specifically requested additional testimony related to electronic messaging to help analyze the copies of emails presented. Tr. at 1304–1310.

In addition, the Committee carefully scrutinized all of the exhibits that Respondent presented, as well as the documents that Respondent claimed were falsified by Mr. Holman or others. With respect to the latter, the Committee found no evidence that anyone other than Respondent falsified any documents.

Sadly, the Committee could not draw the same conclusion about certain of Respondent's exhibits[28] and statements before the Committee. We agree with Bar Counsel that all of this "evidence" should have been produced well in advance of the disciplinary hearings, and what was presented at the hearing was created by improper means. Based on clearly visible irregularities in form, content, availability and presentation, the Committee has determined that the following exhibits and evidence (in addition to those presented to the City Council) were fabricated or altered by the Respondent: (i) Respondent's eight-page chronology, RX 2, was a falsely altered version of a nine-page chronology that she prepared and gave to Agent Scavdis on August 9, 2001; (ii) a fax cover sheet addressed to Agent Scavdis, dated September 21, 2001 (RX 3) was falsified; and (iii) RX 4, a purported e-mail sent to OIG on July 20, 2001, is a falsified docu-

28. The Committee feels that it is important to note for the record that its findings were not based on any belief that we are document experts. To the contrary, the indicia of falsification were so obvious in Respondent's exhibits that even a casual observer would have grounds to doubt their authenticity. Examples of the poor quality of fabrication included multiple typesets in the same paragraph and document; multiple textural planes in the same document; unconventional electronic signatures and formats, which indicated typeovers on source documents; and incongruous date and time stamps that belie the dates of occurrence in the text. In the Committee's view, none of these irregularities could be attributed to the ordinary image quality or document integrity deterioration that can occur over time due to storage, handling and multiple copying.

ment that Respondent never sent during the period in question. In addition, the Committee has determined that Respondent made false statements in her pleadings and statements submitted to the Committee. Respondent falsely represented in her Motion to Strike Bar Counsel Exhibits (BX 59) and at the hearing (Tr. at 28) that she did not receive Mr. Holman's March 26, 2001 e-mail (BX 5), and did not provide a memorandum in response to it. BX 6A. Although the Respondent never took the witness stand, she did make numerous statements to the Committee that went beyond mere legal argument and conjecture. Respondent made false statements in the hearing about her actions including, but not limited to, that she testified truthfully before the D.C. Council (Tr. at 25–26, 1654) and that she provided Mr. Holman the March 15, 2001 memo (Tr. at 27, 1667, 1670). Bar Counsel presented clear and convincing evidence of these breaches of Rule 8.1(a).

D. *Rule 8.4(c) (engaging in dishonesty, fraud, deceit, or misrepresentation)*

Rule 8.4(c) states that it is professional misconduct for a lawyer "to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." [T]he term "dishonesty" includes not only fraudulent, deceitful or misrepresentative conduct, but also "conduct evincing 'a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness.'" *In re Shorter,* 570 A.2d 760, 767–68 (D.C.1990) (*per curiam*) (quoting *Tucker v. Lower,* 200 Kan. 1, 434 P.2d 320, 324 (1967)); *see also In re Cleaver–Bascombe,* 892 A.2d 396, 404 (D.C.2006).

Respondent's entire effort to picture herself as a whistleblower concerning the contract awards for CLA involved multiple violations of Rule 8.4(c). In fact, each misrepresentation built on the prior one, ultimately creating an unbroken chain of deceit and misrepresentation that ran all the way through this Committee's proceedings. As discussed above, the chain started with Respondent's written statements and testimony before the City Council on March 7 and March 27, 2003 (e.g., that she told Agent Scavdis that Mr. Holman was steering contracts to CLA and had sent him via email written descriptions of such conduct for his further investigation). These allegations were supported by the submission of false evidence for the City Council's consideration in its oversight of the OIG and by grossly embellished testimony. *See* Findings of Fact 43–59, *supra.* The submission of false evidence pervaded Respondent's defense in this Committee's proceedings where she presented falsified documents and made false statements in her pleadings and before the Committee. *See* Findings of Fact 69–79, *supra.*

The Committee finds that there was clear and convincing evidence that Respondent violated Rule 8.4(c).

## IV. SANCTION

The factors to be considered in determining the appropriate sanction include "the seriousness of the misconduct, sanctions for similar misconduct, prior discipline, prejudice to the client, violations of other disciplinary rules, whether the conduct involved dishonesty, the respondent's attitude, and circumstances in aggravation and/or mitigation." *In re Evans,* 902 A.2d 56, 74 (D.C.2006) (citing *In re Hutchinson,* 534 A.2d 919, 924 (D.C.1987) (en banc)).

### A. *Seriousness of Conduct*

Respondent made intentional misrepresentations and submitted false statements under oath to a duly convened hearing of the City Council of the District of Colum-

bia in 2003. This trail of falsehoods adversely impacted the careers and reputations of specific public and private figures alike. Respondent also submitted altered documents and made false statements to a Hearing Committee, conduct that goes to the heart of the disciplinary system.

### B. *Prior Offense*

The Board on Professional Responsibility has also recommended that Respondent be sanctioned for other conduct that involves a different set of facts, but also stems from her tenure at OHR. *See In re White,* Bar Docket No. 292–04 (BPR Aug. 20, 2009). There, Respondent was found to have violated Rule 1.11, by representing a client in 2003–2004 in a matter on which Respondent had been personally and substantially involved as an employee of the District of Columbia Office of Human Rights in 2002. Moreover, and particularly relevant for this proceeding, is the fact that the Board also found numerous inconsistencies in her testimony during those disciplinary proceedings. The Board recommended that she be suspended for six months and show fitness as a condition of reinstatement. *Id.* The case is pending consideration by the D.C. Court of Appeals.

### C. *Prejudice*

Respondent's conduct prejudiced no particular client, but as noted above, it did undermine the City Council deliberations and it unfairly damaged the reputations of several OIG agents. Also, the discipline process was harmed by Respondent's falsities to the Hearing Committee.

### D. *Mitigation*

No mitigating evidence was presented by Bar Counsel or Respondent.

### E. *The Respondent's Attitude*

At no point did Respondent ever express any hint of regret or remorse for anything that has happened since 2001 or any acknowledgement of wrongdoing. Also, Respondent's erratic behavior during the hearing left a significant doubt in the minds of the Committee concerning her stability, which in turn raises concerns about her ability to represent others according to the standards established by the Rules. In particular, Respondent on more than one occasion accused the Committee of being biased against her and not allowing her an adequate opportunity to be heard and defend herself. In fact, without any warning or specific provocation, Respondent charged on one occasion that the Chairman was particularly biased against her and that as a result, she intended to make a motion to suspend the proceedings so that they could be re-heard by a different panel See Tr. at 683–85.

The record shows that Respondent was given more than ample opportunity to defend herself. The hearing covered six days and almost eighteen hundred pages of transcripts involving testimony from no less than 10 witnesses. Furthermore, the Committee gave the Respondent the opportunity to ask questions of witnesses that were not always obviously relevant and gave the Respondent broad latitude in the manner in which she asked such questions, often over the objection of Bar Counsel who asserted that the questioning was tantamount to testifying.

The Committee is very confident that its review and handling of this case has been free of any bias whatsoever against the Respondent, and that any objective observer would come to this conclusion based on its own review of the record. Finally, the Committee would also note that even the Respondent stated at the beginning of her closing argument that she had experi-

enced a change of mind with respect to whether the Committee could fairly adjudicate her case: "I did have doubts as to ... whether or not you all were going to be, apply the rules situation, and basically assure that Bar Counsel actually sticks to the standard of proof ... but I do believe that ... whatever decision its, that this is a fair and just decision." Tr. at 1651.

## F. *Range of Sanction*

The Hearing Committee has carefully reviewed Bar Counsel's post-hearing submission recommending disbarment. Respondent made no submission at all. After considering the forgoing, and the necessary factors for recommending a sanction listed above, the Committee has determined that disbarment is appropriate.

The seriousness of the misconduct, coupled with the level of dishonesty and the number of violations, presents a very significant question about Respondent's fitness to practice law. Bar Counsel presented clear and convincing evidence that Respondent submitted falsified documents to the City Council (*see* Findings of Fact 43–48, 62, *supra*), and at least three falsified exhibits to the Hearing Committee. *See* Findings of Fact 69–76, *supra*. The events occurred over a long period, during which time Respondent had ample opportunity to accept responsibility for her actions. Instead, she did the opposite—she falsified documents to submit to a Hearing Committee that was considering charges that she had, *inter alia*, submitted falsified documents to another body. In addition, Respondent, who did not testify, made false statements to the Committee in her pleadings and representations. *See* Findings of Fact 64–79, *supra*.

While there was no impact on clients, there has been prejudice with an undefined effect on third parties, and prejudice to the judicial and disciplinary systems, as shown above. Similarly, because Respondent sought to include many of her falsifications in her civil action against the District of Columbia, there was attempted prejudice to that proceeding, albeit unsuccessful because the court granted judgment as a matter of law to the District after Respondent presented her evidence. Finally, Respondent interfered with the proper functioning of the disciplinary process by her deceitful conduct with Bar Counsel and the Hearing Committee.

Respondent's continued misconduct over a period of several years and the lack of remorse for her actions led this Committee to focus on disbarment as an appropriate sanction. Disbarment is consistent with sanctions imposed in other cases. *In re Goffe* involved a respondent who forged evidence and gave false testimony that prejudiced a judicial proceeding. 641 A.2d 458 (D.C.1994) (per curiam). In *Goffe* the attorney was disbarred for offering the Internal Revenue Service a check he knew was altered and for lying under oath in tax court, claiming he did not tender the check; submitting contracts with signatures he forged to a trial court in a separate action; and fabricating notarizations of documents filed with the recorder of deeds. *Id.* Thus, in *Goffe*, as is the case here, the attorney was found to have lied and to have created and presented falsified documents. The only difference from *Goffe* is that it was clear there, but not here, that Goffe's conduct was motivated by economic gain. In making its decision to disbar Goffe, the court noted that Goffe's disciplinary violations were "all in order to obtain an economic benefit." *Goffe*, 641 A.2d at 465. Here, despite Bar Counsel's arguments, the connection between Respondent's conduct and her efforts to obtain monetary compensation based on wrongful dismissal are too atten-

uated to be convincing. And certainly no prospect of economic gain motivated Respondent's misconduct during the disciplinary proceedings, because her civil case had already been dismissed.

Although *Goffe* provides support for disbarment, it is not conclusive absent evidence of a personal economic benefit as a motivating or otherwise significant factor in the Respondent's conduct. The Committee therefore looked at a more recent decision for guidance in determining whether a recommendation of disbarment is appropriate here.

In *In re Cleaver–Bascombe*, 986 A.2d 1191 (D.C.2010), the Court of Appeals held that the Board's finding of clear and convincing evidence that the attorney had submitted a fraudulent voucher seeking payment from taxpayer funds for work she did not perform and had given false testimony to cover-up the misconduct at a disciplinary hearing required disbarment, *see id.,* even though the Board had recommended a two-year suspension with a fitness requirement for reinstatement. As in *Goffe,* Cleaver–Bascombe engaged in the misconduct for the purpose of personal financial gain; however, the Court was clear in its opinion that it was the conduct itself, not the motive behind it, that warranted disbarment. *See Cleaver–Bascombe,* 986 A.2d at 1200. The Court looked at whether Cleaver–Bascombe's actions were consistent with other serious misconduct that warranted disbarment. *See id.* at 1199–1200. It determined that submitting a fraudulent voucher amongst multiple valid ones and then testifying to its authenticity was intolerable attorney conduct and that disbarment was well within the range of sanctions imposed in other cases.

Respondent's misconduct was more egregious than Cleaver–Bascombe's. Al-though Cleaver–Bascombe falsified documents and lied under oath, her actions involved only one episode of misconduct and put only her own career and reputation at risk. *See id.* Despite the fact that it was Cleaver–Bascombe's first offense, the Court determined that disbarment was the appropriate sanction. *See id.* at 1198–1201. Respondent's misconduct, on the other hand, spanned multiple years, affected three separate proceedings, and negatively impacted the careers and reputations of other individuals and the integrity of the disciplinary system. Like Cleaver–Bascombe, Respondent lied in perpetuation of her previous dishonesty in an attempt to avoid a sanction rather than showing remorse for her misconduct. Respondent also has a record of discipline, unlike Cleaver–Bascombe.

The appropriate sanction in a disciplinary action is one that (a) protects the public and the courts; (b) is necessary to maintain the integrity of the profession; and (c) will deter other attorneys from engaging in similar misconduct. *In re Uchendu,* 812 A.2d 933, 941 (D.C.2002). Under this standard, the underlying facts of this case, Respondent's response to the disciplinary process, and her previous disciplinary history, disbarment is the proper sanction. The record shows that Respondent "lacks the moral fitness to remain a member of the legal profession." *Cleaver–Bascombe,* 986 A.2d at 1200–1201.

## V. RECOMMENDATION

There is clear and convincing evidence that Respondent engaged in ethical misconduct in violation of Rules 3.4(a), 3.4(b), 8.1(a), 8.4(b), 8.4(c), and 8.4(d). For all of the foregoing reasons, Committee recommends that Respondent be disbarred.

HEARING COMMITTEE NUMBER NINE

/RHS/
Richard H. Sinkfield III, Esq.
Chair

/JM/
Jack McKay, Esq.
Attorney Member

/TP/
Ms. Twanna Price
Public Member

Dated: April 20, 2010

This Report and Recommendation was drafted by Attorney Member Jack McKay and Committee Chair Richard H. Sinkfield III.